ef112103.txt

1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION


QUINTIN HAWKINS,

          Plaintiff,

vs.                                      CASE NO.

THOMAS STANTON, et al.,                  C-1-01-783

          Defendants.


DEPOSITION OF:  ESTHER MAE FUNK

          Videographic deposition of ESTHER MAE FUNK,
taken pursuant to Notice, before Melanie Reagan
Strange, Court Reporter and Notary Public, State of
Alabama at Large, in the Ramada Inn, Huntsville
Airport East, 8716 Madison Boulevard, Huntsville,
Alabama, on the 21st day of November, 2003,
commencing at 1:30 p.m. pursuant to the stipulations
set forth herein.


          Melanie Reagan Strange, Court Reporter

ef112103.txt

2

1                    S T I P U L A T I O N S

2              IT IS HEREBY STIPULATED AND AGREED, by and

3    between counsel that the videographic deposition of

4    ESTHER MAE FUNK may be taken on the date and time

5    specified and in the action denominated herein before

6    Melanie Reagan Strange, Court Reporter and Notary

7    Public.

8              IT IS FURTHER STIPULATED AND AGREED that the

9    signature to and reading of the deposition by the

10   witness is waived, the deposition to have the same

11   force and effect as if full compliance had been had

12   with all laws and rules of Court relating to the

13   taking of deposition.

14             IT IS FURTHER STIPULATED AND AGREED that it

15   shall not be necessary for any objections to be made

16   by counsel to any questions, except as to form or

17   leading question, and that counsel for the parties

18   may make objections and assign grounds at the time of

19   trial or at the time said deposition is offered on

20   evidence, or prior thereto.

21             IT IS FURTHER STIPULATED AND AGREED that

22   notice of filing of this deposition by Commissioner

23   is waived.

3

ef112103.txt

```
1                    A P P E A R A N C E S

2

3         APPEARING ON BEHALF OF THE PLAINTIFFS:

4                 Mr. Fanon A. Rucker
                  Attorney at Law
5                 Santen & Hughes
                  312 Walnut Street
6                 Suite 3100
                  Cincinnati, Ohio  45202
7

8         APPEARING (via telephone) ON BEHALF OF THE DEFENDANT:

9                 Mr. Michael J. Harmon
                  Senior Assistant Trial Counsel
10                City of Cincinnati
                  801 Plum Street
11                Room 214
                  Cincinnati, Ohio  45202
12

13                Mr. Stephen S. Lazarus
                  Attorney at Law
14                Hardin, Lefton, Lazarus & Marks, LLC
                  915 Cincinnati Club Building
15                30 Garfield Place
                  Cincinnati, Ohio  45202
16

17        APPEARING ON BEHALF OF THE CITY OF HUNTSVILLE:

18                Mr. M. Bruce Pitts
                  Assistant City Attorney
19                City of Huntsville
                  P. O. Box  308
20                Huntsville, Alabama  35801

21

22        ALSO PRESENT:

23                Mr. Don Griffin, Videographer
```

4

```
1                        I N D E X
                         Page 3
```

ef112103.txt

2                    WITNESS:  ESTHER MAE FUNK

3                                                    PAGE

4        Examination by Mr. Rucker               6-51

5        Examination by Mr. Harmon               51-60

6        Examination by Mr. Lazarus              60-61

7        Further Examination by Mr. Rucker       63-65

8

9        Reporter's Certificate of Completion       66

10       ---------------------------------------------------

11                        INDEX OF EXHIBITS

12

13       PLAINTIFF'S EXHIBITS:                    MARKED

14       (Plaintiff's Exhibit Numbers 1-18 for the deposition

15            of Esther Mae Funk were marked prior to start

16                        of proceedings.)

17

18

19

20

21

22

23

5

1     11/21/03          PROCEEDINGS            1:30 p.m.

2                (Whereupon, Plaintiff's Exhibit Numbers 1-18

Page 4

ef112103.txt
3            were previously marked for identification.)
4       MR. GRIFFIN:  On the record, 1:28 p.m.,
5    November 21st, year 2003.  We're doing the deposition
6    of Ms. Esther Funk.  At this time, this deposition is
7    being taken at the Ramada Hotel, Airport Huntsville
8    Alabama.  At this time, would the attorneys identify
9    themselves for the record starting with the
10   Plaintiff's attorney.
11       MR. RUCKER:  My name is Fanon A. Rucker.  I'm
12   with Santen & Hughes.  I am the attorney for the
13   Plaintiff, Quintin Hawkins in Quintin Hawkins versus
14   Thomas Stanton, et al.
15       MR. GRIFFIN:  Okay.  You guys on the
16   telephone.
17       MR. HARMON:  Good afternoon.  My name is
18   Michael J. Harmon, middle initial J as in James.  I
19   am senior trial counsel for the City of Cincinnati,
20   Ohio.  I represent the City of Cincinnati, Ohio and I
21   represent the Cincinnati police officers named as
22   defendants in this case.
23       MR. LAZARUS:  Steve Lazarus, attorney for the

                                                        6
1    defendant officers in their individual capacities.
2       MR. PITTS:  I'm Bruce Pitts.  I'm assistant
3    city attorney with the City of Huntsville.
4       MR. GRIFFIN:  Ms. Court Reporter, would you
                          Page 5

ef112103.txt

5      swear the witness, please?

6                      ESTHER MAE FUNK,

7      being first duly sworn, was examined and testified as

8      follows:

9

10     EXAMINATION BY MR. RUCKER:

11  Q.  Ms. Funk, I previously introduced myself.  Once

12      again, I'm Fanon Rucker, and I represent Quintin

13      Hawkins in this case.  I'm just going to ask you a

14      few questions.  Just going back a couple of years,

15      I'm going to ask you to answer to the best of your

16      memory.  I do have a few documents that we've

17      previously discussed, and we're going to have

18      introduced on the record.  But have you ever had your

19      deposition taken before?

20  A.  No.

21  Q.  The court reporter, as you see to your right, is

22      taking down everything that you say, so it's

23      important that you give verbal responses to the

7

1      questions.  Head nods and head shakes are not

2      recognized on the record very well.  If there's a

3      question that I ask that you do not understand,

4      please let me know.  I'll try to ask it, ask it in a

5      more clear way.  If you need to take a break, please

Page 6

ef112103.txt

```
 6      ask me.  That's fine.  If you need to speak to your
 7      counsel, don't hesitate to do that.  I don't expect
 8      this is going to go very long, but this is not
 9      intended to be a marathon.  These are not intend to
10      harass you, annoy you or anything else.  Just trying
11      to get to some information.  Could you once again
12      state your name and spell your last name for the
13      record?
14   A. Esther Funk, F-u-n-k.
15   Q. And what is -- how are you employed?
16   A. I'm employed in the Huntsville Police Department in
17      records, third shift.
18   Q. And how long have you been employed by the Huntsville
19      Police Department in the records division?
20   A. Approximately 23 years.
21   Q. And what is your title?  What is your job title?
22   A. Records supervisor, third shift.
23   Q. And were you the supervisor in July and August of
```

                                                       8

```
 1      2001?
 2   A. Yes, I was.
 3   Q. What is your general job responsibilities as
 4      supervisor in the records division?
 5   A. I oversee all of the, what records and everything are
 6      typed into the computers.  I oversee what my clerks
 7      do and my fingerprint technicians do.
```

ef112103.txt

```
 8   Q.  And approximately how many employees are under your
 9       supervision in that position?
10   A.  Eight.
11   Q.  Was that also generally true in July and August of
12       2001?
13   A.  I don't remember.
14   Q.  Okay.  All right.  Were your duties in 2001 generally
15       as they are right now?
16   A.  Yes.
17   Q.  And as part of your responsibilities, are you
18       sometimes the person who actually enters information
19       on the computer?
20   A.  Yes, if there's help that is needed.
21   Q.  You indicate you work third shift?
22   A.  Yes.
23   Q.  Specifically what time is that?
```

                                                              9

```
 1   A.  It's from 11:00 o'clock at night until 7:00 in the
 2       morning.
 3   Q.  You're here, and I guess will be reporting to work
 4       later this evening, and we appreciate you and your
 5       attention this afternoon.  Are you familiar with the
 6       NCIC?
 7   A.  Yes, I am.
 8   Q.  What do those letters stand for, if you can?
```

ef112103.txt

9   A.  I really can't tell you.

10  Q.  Okay.  And are you familiar with the RCIC --

11          MR. HARMON:  Mr. Harmon for the City.  I could

12      not hear that answer.

13  Q.  (BY MR. RUCKER:)  Okay.  Please repeat -- what do the

14      letters NCIC stand for?

15  A.  I'm not sure.

16  Q.  Okay.  Are you familiar with the RCIC?

17  A.  No, I am not.

18  Q.  The NCIC, not specifically needing the name of it,

19      what is the NCIC?

20  A.  The NCIC is a nationwide computer system that goes

21      through all the states.

22  Q.  And what is its purpose, to your knowledge?

23  A.  The purpose is to run tags, driver's license, receive

                                                    10

1       messages from other departments.

2   Q.  Are you familiar with a computer program called

3       LEADS?

4   A.  I-LEADS?

5   Q.  Well, LEADS, yes.  LEADS, I-LEADS, L-E-A-D-S?

6   A.  Yes.

7   Q.  What is LEADS as it relates to NCIC or does it?

8   A.  I'm not real sure.  I'm not sure exactly what you're

9       asking.

10  Q.  What is I-LEADS?

ef112103.txt

11    A.    I-LEADS is our computer system where we enter

12          everybody involved in cases and arrest reports that

13          come through our department.

14                MR. HARMON:  This is Mr. Harmon again asking

15          for clarification.  Could we spell what you're

16          talking about?

17    Q.    (BY MR. RUCKER:)  Okay.  If you could spell I-LEADS?

18    A.    I-LEADS, I-L-E-A-D-S.  That's the computer system

19          that the Huntsville Police Department uses to store

20          information from our case reports and arrest reports.

21    Q.    And do you know if the I-LEADS program and NCIC ever

22          communicate with each other?

23    A.    No.

11

1    Q.    You don't know or no they don't?

2    A.    As far as I know, no.

3    Q.    The information that's input into I-LEADS, who

4          specifically puts that information in?

5    A.    The clerks and the I-LEADS technician.

6    Q.    And where does the information -- what is the source

7          of the information that's input into that, into that

8          computer program?

9    A.    The source --

10    Q.    Yes.

11    A.    -- is the case reports and arrest reports.

ef112103.txt

```
12   Q.   Okay.  Could you describe the work environment where
13        the information is input into the computers?  Are
14        there a number of desks?  Is it an enclosed area?
15        Could you describe it physically?
16   A.   It's a big room.  We have -- excuse me -- we have
17        maybe ten cubicles.  The NCIC room is off to itself.
18   Q.   Are there files in the immediate area?
19   A.   Yes, there are.
20   Q.   Okay.  And how many persons -- is this where all of
21        the persons and clerks in the records division work?
22   A.   Yes, sir.
23   Q.   And if information is sought or is given to persons,
```

                                                              12

```
1         does the information generally come from this
2         particular room or this particular area?
3    A.   Yes.
4    Q.   Just as a matter of general information, when someone
5         calls to indicate that they are, that they have an
6         individual wanted by the Huntsville Police
7         Department, what is the procedure?   What do you --
8         what does the records division do?
9    A.   The records division first makes sure that the
10        warrant or want is still active, that we do have it
11        in hand, and then we try to verify that whoever this
12        other agency has is the person that we want.
13   Q.   And is that by manual search generally?
```

ef112103.txt

14    A.  Yes.

15    Q.  Specifically in the early morning hours of July 31st,

16        2001, were you on duty?

17    A.  Yes, I was.

18    Q.  Have you been on third shift consistently since at

19        least July of 2001?

20    A.  Yes.

21    Q.  And if you recall, and understanding it was over two

22        years ago, was there anything unusual about that

23        early morning hours?  Was it extra busy?  Was it

13

1         extra slow?  Is there anything that you recall about

2         the general nature of business on that particular

3         day?

4     A.  I don't remember.

5     Q.  Okay.  While you were on duty, did you receive

6         information, any contact from Cincinnati, LYLE (sic)?

7     A.  Yes, we did, as far as the documents that are in

8         front of me.

9     Q.  Okay.  And the first document I'm going to ask you

10        about has been marked as Exhibit 1.  Could you

11        identify, first of all, the nature of the document?

12        What is that document?

13    A.  It's a hit confirmation request from Ohio requesting

14        on a warrant.

Page 12

ef112103.txt

15    Q.   And is this printout what would have been available

16         to you on a computer screen on July 31st, 2001?

17    A.   Yes, sir.  It would have came through our NCIC

18         machine.

19    Q.   And you're able to print those out?

20    A.   Yes, sir.

21    Q.   Is there, I guess, a dot matrix printer that's

22         attached to the NCIC computer?

23    A.   It's a printer-type, yes.

14

1     Q.   Okay.  And does everything that comes on the screen

2          appear also on the printer?  Is everything printed

3          out?

4     A.   Yes.

5     Q.   And is that the source of this particular document

6          that's been marked right now as Exhibit 1?

7     A.   Yes, sir.

8     Q.   Is there any way to indicate what time this message

9          would have come into Huntsville from Cincinnati by

10         looking at the document?

11    A.   I know it arrived at our department at 4:45.

12    Q.   Is that the notation at the very, well, right below

13         MSG 1731, where it says 04:45 7/31/2001?

14    A.   Yes.

15    Q.   Does that indicate that it came in at 4:45 on the

16         morning of July 31st, 2001?

ef112103.txt

17   A.   Yes, sir.

18   Q.   Do you know what the other numbers stand for; for

19        instance, the 01749, that may be 7.  I'm not sure

20        what that last number is.  Do you know what those

21        numbers stand for?

22   A.   No, sir.  The 017497?

23   Q.   Yes.

                                                        15

1   A.   That is the number message that NCIC attaches to

2        whatever comes through to our computers.

3   Q.   So if you know, would that mean that there have been,

4        prior to this message, 17,496 messages to Alabama

5        specifically or just sent within a 24-hour period?

6   A.   I'm not real sure.

7   Q.   Directly below that line there is a YQ.0HCIP number.

8        Do you know what those numbers and letters stand for?

9   A.   YQ just stands for hit confirmation request.  The

10        number that begins with OH is Ohio's ORI, and the

11        number that begins with AL is Huntsville Police

12        Department's ORI.

13   Q.   You mentioned ORI.  What is ORI?

14   A.   It's a number that is individually given to the

15        police departments to identify them through NCIC.

16   Q.   And when you say ORI, does that indicate originating

17        agency, if you know?

ef112103.txt

18   A.   Most likely.

19   Q.   Okay.  Thank you.  And I understand -- and you're not

20        employed by NCIC, correct?

21   A.   No.

22   Q.   And understanding that, you're answering to the best

23        of your knowledge about these particular letters and

16

1         numbers.  Directly below there it says 2:45 and

2         there's a 07/31/2001.  Do you know what that number

3         represents?

4    A.   Where specifically are you talking about?

5    Q.   Where it says 2:45, about two spaces below the YQ.

6    A.   Okay.  I would assume that is the time that Ohio sent

7         their message.

8    Q.   And there is a significant time between 2:45 and

9         4:45.  Is it your understanding there is some lapse

10        of time when messages are sent and received?

11   A.   As far as I know, that is the, right, the time frame

12        that they send it and we receive it to Alabama.

13   Q.   Okay.  What is the nature of this message, if you

14        recall?

15   A.   This message here is just our first notice from Ohio

16        stating that they have a Quintin Hawkins, and they

17        want us to confirm that we have a warrant.

18   Q.   Did you personally know about Quintin Hawkins prior

19        to this message being sent?

Page 15

ef112103.txt

20   A.   No.

21   Q.   Had you heard of a Quintin Hawkins?

22   A.   No.

23   Q.   Who was the individual, according to this document,

                                                              17

1        that you were to have contact with regarding this

2        issue?

3    A.   Well, it gives the name of requester.  It's PO

4        Stanton.

5    Q.   Okay.  And does that indicate the agency name?

6    A.   PD, Cincinnati, Ohio.

7    Q.   And there's also there a phone number and a fax

8        number for Officer Stanton?

9             MR. HARMON:  Objection.  You may answer.  This

10       is Mike Harmon.

11            THE WITNESS:  Yes.  It does give a phone

12       number and fax number on the teletype.

13   Q.   (BY MR. RUCKER:)  And although the document speaks

14       for itself, where it says "fax number," you're

15       referring to 513-946-6149?

16   A.   Yes.

17   Q.   All right.  And phone number, 513-352-2938?

18   A.   Yes.  That's what it gives on the teletype.

19   Q.   Thank you.  In the message, it looks like they're

20       requesting copies of fingerprints and photo.  Do you

ef112103.txt

21    know if -- well, strike that.  Whatever happened with

22    this first message; do you know?

23  A.  I don't really remember.  I'm not sure how busy we

                                                    18

1     were.

2  Q.  Okay.  I'll ask you to turn to your next document.

3      It's been identified as Exhibit 2.  Could you

4      identify that document, please?

5  A.  Yes.  It's a teletype that came from Ohio, a second

6      notice on a hit confirmation request.

7  Q.  And in the upper left corner there is a 5:08.  Do you

8      see that number there?

9  A.  Yes, sir.

10  Q.  Does that indicate to you that this message was

11      received by Alabama on or about 5:08 in the morning

12      on 7/31?

13  A.  That's what it gives.

14  Q.  And that was approximately 20 minutes after the

15      original message was received?

16  A.  Yes, sir.

17  Q.  Before we go further, are these documents sequential;

18      in other words, is this how they came out on the NCIC

19      printout?

20  A.  Yes, sir.  You can usually tell by the time at the

21      top of the teletype.

22  Q.  And it indicates this is the second notice?

ef112103.txt

23    A.  Yes, sir.

19

1     Q.  Did you personally receive this message or did
2         someone else in your office, if you recall?
3     A.  I do not recall.
4     Q.  At some point after these messages were received you
5         were made aware that they had come through?
6     A.  Yes, sir.
7     Q.  After this second notice was received, what did you
8         do?
9     A.  If you'll look at Exhibit 3, it gives a teletype
10        where we sent it to Ohio stating that we're in the
11        process of confirming their teletype, their request,
12        and that it would take one hour to try to confirm it.
13    Q.  And are you referring to what's been previously
14        marked as Exhibit 3, the following document, where it
15        begins at the top, looks like "YR.AL0470100."
16    A.  Yes, sir.
17    Q.  All right.  Turning briefly back to Exhibit 2, there
18        is some handwriting on that page.  The first is at
19        the upper right-hand corner, the MSG 1731.  Is that
20        your handwriting on that document?
21    A.  Yes, sir.
22    Q.  What does that stand for?
23    A.  It's a message number that we individually give to

ef112103.txt

20

```
 1        all messages that come through NCIC that we have to
 2        respond to.
 3    Q.  Okay.  And is this, the 1731, does it have any
 4        significance regarding the 31 referring to a county
 5        name or just 17?
 6    A.  No.
 7    Q.  Okay.  And there is also handwriting near the bottom
 8        corner of the page.  Is that your handwriting?
 9    A.  Yes, sir.
10    Q.  And could you just describe what is that information
11        referring to?
12    A.  Well, I'm not sure what I put for District 2.  I know
13        that I did talk to or I requested a phone number, and
14        they gave me Officer Stanton, and they gave a number
15        for the Houston County Justice Center, and the phone
16        number is down there.
17    Q.  Okay.  And where it says "Houston County Justice
18        Center," would that also be the Hamilton County
19        Justice Center?
20    A.  I'm not sure.
21    Q.  Okay.  And that phone number that's down there was
22        the number to the justice center, to your knowledge?
23    A.  As far as I can remember.
```

ef112103.txt

21

1   Q.   Okay.  Turning to Exhibit 3, previously identified.
2        From the notation at the upper corner of the page,
3        does it indicate that you sent this message
4        approximately ten minutes after the previous message?
5        In looking at the 3:09 on Exhibit 2, comparing that
6        to the 3:19 on Exhibit 3?
7   A.   No, because as far as I know that is the time that --
8        just one moment.  That appears to be the time that
9        they received it.
10  Q.   Okay.  Thank you.  All right.  And you indicate on
11       this you left a phone number for them to contact; is
12       that correct?
13  A.   Yes, sir.
14  Q.   Subsequent to this document, Exhibit 3, did you
15       receive a phone call from Cincinnati after leaving
16       your phone number there?
17  A.   As far as I can remember, no.
18  Q.   Thank you.  Following the next exhibit, Exhibit 4,
19       could you identify that document, please?
20  A.   That is the second response that I sent stating that
21       we were still -- we received their hit request, and
22       we were still checking on it.
23  Q.   And upon sending this message or prior to sending

ef112103.txt

22

```
 1      this message, had you spoken by phone with anyone in
 2      Cincinnati?
 3   A. I don't remember.
 4   Q. Thank you.  Following Exhibit 5.  Could you identify
 5      that document, please?
 6   A. Yes.  It is our hit confirmation response.  We are
 7      saying that our warrant on Quanza Hawkins is active,
 8      and it states that we are still trying to attempt to
 9      get a fingerprint class on the subject.
10   Q. There's also information regarding a tattoo.  Could
11      you read that part, please?
12   A. "Subject should have a tattoo of on upper right arm
13      of 'hard knocks of life.'".
14   Q. And the information that you -- I'm sorry.  This was
15      information that you sent to Hamilton County,
16      correct; well, to Cincinnati, to Hamilton County, to
17      Ohio?
18   A. This is what we put on the teletype.
19   Q. All right.  And where did you receive the information
20      to send to Cincinnati?
21   A. It came from our I-LEADS system.
22   Q. And did you receive that information by hand search,
23      by computer; how did you receive that information?
```

ef112103.txt

23

1  A.  Computer.
2  Q.  All right.  Prior to this message, had you attempted
3      or had you made contact with any member of the
4      Huntsville Police Department regarding this hit?
5  A.  I don't remember.
6  Q.  Certainly at some time between the first message
7      being received and the last message being received,
8      you were able to contact, you contacted someone with
9      the, excuse me, Huntsville Police Department
10     regarding this matter?
11 A.  I don't remember.
12 Q.  Okay.  Do you recall contacting Sergeant Reynolds?
13 A.  Yes, I do.
14 Q.  Okay.  And would that have been sometime during this
15     exchange at some point?
16 A.  That was sometime during the teletypes, yes, sir.
17 Q.  Thank you.  The last line, it looks like, on the
18     message is that "We will TTY your department further
19     as soon as we can get a picture."  Was that
20     information that you had received from Sergeant
21     Reynolds?
22 A.  Yes, sir.  I had discussed that with Sergeant
23     Reynolds that we didn't have fingerprints, and he

24

ef112103.txt

1      said he possibly had a picture that he could fax, as
2      far as I can remember.
3   Q. Thank you.  Ask you to turn to Exhibit 6, please.
4   A. (Witness complies.)
5   Q. I ask if you can identify this document for the
6      record?
7   A. It's a teletype that came from Ohio stating that the
8      subject had signed a waiver and gave a pickup date.
9   Q. Now, between the message on --
10            MR. HARMON:  Excuse me.  Mr. Harmon here.
11      What exhibit number was that one that said he had
12      signed a waiver?
13            MR. RUCKER:   Number 6.
14            MR. HARMON:  Thank you.
15            MR. RUCKER:  Thank you.
16   Q. (BY MR. RUCKER:)  Now, was it your understanding
17      between Exhibit Number 5 and Exhibit Number 6 that
18      there was no further communication by TTY with
19      Hamilton County or Cincinnati regarding this subject?
20   A. If you'll look at Exhibit 7, it appears to be out of
21      order.
22   Q. Okay.
23            MR. HARMON:  That's the reason for my

25

1      question.
Page 23

ef112103.txt

2           MR. RUCKER:  Yes.

3           THE WITNESS:  And Number 8 and Number 9.

4           MR. RUCKER:  That's correct.  Okay.  So I'm

5      going to have to go back.

6   Q.  (BY MR. RUCKER:)  Okay.  So Number 6 appears to be

7      out of order?

8   A.  Yes, sir.

9   Q.  All right.  So going from Number 5, would the next in

10     sequence being Number 7?

11  A.  Yes, sir, it would.

12  Q.  Thank you.  And Number 7, does that appear to be the

13     next message that you received from Cincinnati

14     regarding this matter?

15  A.  Yes, sir.

16  Q.  And if you can tell from the numbers, approximately

17     how long after the message at Number 5 was the

18     message for Number 7 received?

19  A.  Appears to be about an hour, if I'm not mistaken.

20  Q.  Is that based on the numbers 5:41 in Exhibit 5 and

21     the numbers 6:39 at the top of Exhibit 7?

22  A.  Yes, sir.

23  Q.  Thank you.  And was it your understanding from

26

1      Exhibit 7 that Cincinnati had confirmed the prints

2      from the FBI, the FBI had confirmed the print of the

Page 24

ef112103.txt

3  individual that they had in custody?

4  A.  Yes, sir, that's what it states in the teletype.

5      MR. HARMON:   Objection.  This is Mr. Harmon

6  from Cincinnati.  When we're asking if Cincinnati had

7  confirmed, are we talking about Cincinnati, Hamilton

8  County Sheriff's Department or are we talking about

9  the Cincinnati Police Department?  We need to clarify

10  that question.

11  Q.  (BY MR. RUCKER:)  Who did you believe had confirmed

12  from the FBI, had confirmation from the FBI?

13  A.  It states from Hamilton County SO.

14  Q.  Okay.  And you had previously been in contact with

15  Stanton?

16      MR. HARMON:   Objection.  Not in the testimony.

17      THE WITNESS:   I'm not sure.

18  Q.  (BY MR. RUCKER:)  At some point during this exchange,

19  did you speak to Stanton?

20  A.  I know I spoke to someone.  I can't really say for

21  sure since it's been a long time.

22  Q.  When we spoke prior to the deposition, do you recall

23  me asking that question, if you had had a chance to

27

1  speak to anyone by telephone?

2  A.  Yes.

3  Q.  And do you recall who you said that you might have

4  spoken to?

ef112103.txt

5    A.   I know I wrote down the name Officer Stanton on
6         Exhibit Number 2.
7    Q.   And from that note, from what you remember of that
8         night, do you recall that it was Officer Stanton that
9         you spoke to at some point during that evening?
10   A.   I would assume that's who I talked to.
11   Q.   Okay.  And would that have been by telephone?
12   A.   Yes, sir.
13   Q.   Thank you.  And you talked by teletype with someone
14        else or with someone?
15   A.   From somebody, from Ohio.
16   Q.   The person on the teletype never identified
17        themselves specifically; is that correct?
18   A.   No.  We don't talk to each other.  We just send
19        teletypes.
20   Q.   Okay.  But there was at least a telephone
21        conversation that you had with someone in that area?
22   A.   Yes, sir.
23   Q.   And you believe that person to have been Stanton?

                                                          28

1              MR. HARMON:  Objection.
2              THE WITNESS:  As far as I can remember.
3    Q.   (BY MR. RUCKER:)  Thank you.  After the confirmation
4         came that the prints matched the subject in question,
5         what did you do?

ef112103.txt

```
 6   A.  On Exhibit Number 8 I re-sent a teletype stating for
 7       them not to release the subject, that we were still
 8       working on verifying that that subject they had was
 9       the subject we wanted.
10   Q.  And that is Exhibit 8?
11   A.  Yes, sir.
12   Q.  And that's identified with the 6:46 in the upper left
13       corner?
14   A.  Yes, sir.
15   Q.  And you sent that approximately five minutes, five or
16       six minutes after the message indicating that there
17       had been confirmation by the FBI?
18   A.  Yes, sir, approximately.
19   Q.  Thank you.  All right.  Ask you to turn to Exhibit 9,
20       please?
21   A.  (Witness complies.)
22   Q.  And could you identify this document?
23   A.  It's a message that I sent to Cincinnati PD and
```

                                                            29

```
 1       Hamilton County SO stating that Investigator Reynolds
 2       would be faxing their department with a photo.
 3   Q.  And where did you receive the information that
 4       Sergeant Reynolds would be faxing a photo?
 5   A.  I had spoke to him on the phone, and he said he would
 6       attempt to get a photo and fax it to them.
 7   Q.  Thank you.  Did you ever -- did you fax a photo from
```

ef112103.txt

8      your, from the records division?

9   A.  No, sir.

10  Q.  All right.  I'm going to ask you to turn next to what

11      has been previously identified and discussed as

12      Exhibit 6.  Could you identify that document, please?

13  A.  It is a teletype that came from Hamilton County SO,

14      and that is when they said that they had advised that

15      the subject had signed a waiver and must be picked

16      up.

17  Q.  And they gave the contact name of an individual to

18      speak with about the matter?

19  A.  They gave a deputy's name, Jeff Carroll, warrants

20      division.

21  Q.  Okay.  In the body of the message, in the upper

22      corner, I'm going to ask you -- see the second,

23      second sentence.  I guess that's a sentence?

                                                              30

1   A.  It says, "Please advise Lynette Darby at jail records

2       by phone."

3   Q.  Okay.  And were you actually working at the time that

4       this message came in, if you recall?

5   A.  No, sir.

6   Q.  And do you know if anyone ever contacted Lynette

7       Darby at jail records?

8   A.  I do not.

                        Page 28

ef112103.txt

```
 9    Q.  Thank you.  I ask you to point your attention next to
10        Exhibit 10.  Could you identify that document,
11        please?
12    A.  It's a teletype that was sent at 9:19 from Huntsville
13        Police Department saying that Investigator Reynolds
14        would be in touch with your agency for extradition on
15        the subject.
16    Q.  And did you receive that information from Rex
17        Reynolds that he would be getting in contact with
18        their agency?
19    A.  I was not here at the time.
20    Q.  So this message did not come from you?
21    A.  No, sir.
22    Q.  Thank you.  And the last document in this sequence is
23        Exhibit 11.  Could you identify that document,
```

                                                        31

```
 1        please, the nature of it?
 2    A.  It's a document where first shift at 8:44 cleared
 3        subject Quintin Haskins (sic) from NCIC.
 4    Q.  How is a clearance made from NCIC?  What does that
 5        mean to clear somebody?
 6    A.  That means whatever warrant-type information we had
 7        in NCIC, that they would have cleared it out.
 8    Q.  And in order to be able to clear information from
 9        NCIC, does the person have to have access to or does
10        the person have to have certification to be able to
```
                         Page 29

ef112103.txt

11       input information into NCIC?

12   A.   Not necessarily.

13   Q.   Okay.  You say not necessarily.  How can information

14       be sent to NCIC to clear warrants?

15   A.   Well, they'll clear it from NCIC, but if they, if

16       they receive a hit and they have all the messages

17       done and it shows that there is extradition being

18       talked about, they will go ahead and clear that

19       person through NCIC.

20   Q.   But does anyone -- well, I'll ask this:  Does anyone

21       with the Huntsville Police Department have the

22       ability to place information into the NCIC regarding

23       individuals that are wanted by the Huntsville Police

32

1       Department?

2   A.   The clerks do.

3   Q.   And do they have the ability to type in the person's

4       identifying information with the NCIC?

5   A.   They do if it's associated with the warrants that we

6       have with our department.

7   Q.   Now, the documents that have been identified from

8       Exhibits 1 through 11, are these true and accurate

9       representations of the information that was passed on

10       the screen on July 31st and August 1st of 2001?

11   A.   Yes, sir.

ef112103.txt

12    Q.  And are these actually copies of what was printed out

13        from the NCIC printouts that were received on July

14        31st and August 1st, 2001?

15    A.  Yes, sir.

16    Q.  There was mention on Exhibit 7 of a confirmation by

17        the FBI.  Were you aware -- did you ever see any

18        confirmation from the FBI regarding this issue or

19        this matter?

20    A.  We received a fax from -- just a moment.  We received

21        a fax from Hamilton County SO and they, or they faxed

22        us a copy of what the FBI had sent them.

23    Q.  Let me stop you there.  I'm going to ask you to point

                                                              33

1         your attention to Exhibit, I guess it's going to be

2         12.  I'm sorry, Exhibit 14.

3              MR. RUCKER:  And for the record, in case you

4         all don't have it, Exhibit 14 -- well, you have it.

5         Exhibit 14 is a fax from Hamilton County.  It starts

6         at the top "Simon Leis, Jr., Sheriff, Hamilton

7         County, Ohio."  It has two deputy --

8              MR. HARMON:  Badges.

9              MR. RUCKER:  -- badges on there, correct.

10    Q.  (BY MR. RUCKER:)  Now, could you identify the

11        document at Exhibit 14, please?

12    A.  It is a cover sheet that was sent from Hamilton

13        County Sheriff's Office.
                    Page 31

ef112103.txt

14    Q.   And as the supervisor of the records division, did
15         you receive this document or did you review it prior
16         to -- well, did you review this document as
17         supervisor?
18    A.   I don't remember.
19    Q.   At some point, this document went into your custody;
20         is that correct?
21    A.   At some point this was faxed to the police
22         department.
23    Q.   All right.  And the date on the cover sheet indicates

34

1         July 30th of 2001.  Is it possible this document was
2         faxed on July 30th, 2001?
3    A.   It gives that date.  I do not know.
4    Q.   Okay.  But in fact, the information that's contained
5         within the fax wasn't received apparently by Hamilton
6         County until at least July 31st, 2001?
7    A.   It gives the date on the fax that was sent to
8         Hamilton County from the FBI July 31st, 2001.
9    Q.   And the initial contact made with Huntsville by
10        Hamilton County and Cincinnati was on July 31st,
11        2001?
12    A.   Yes, sir.
13    Q.   So the July 30th date on there, that appears to be an
14        incorrect date; is that fair?

Page 32

ef112103.txt

15  A.  That's fair.

16  Q.  And there is a CC of Esther.  Is that the spelling of

17      your name?

18  A.  Yes, sir.

19  Q.  And was -- do you recall if this was given to you

20      sometime in late July or early August?

21  A.  No, I don't.

22  Q.  Thank you.  Turning to the second page of it, which

23      is actually Exhibit 15.  And this document has

35

1       previously been identified in other depositions.  It

2       is a FBI U. S. Department of Justice hit and

3       confirmation dated July 31st, 2001.  Have you seen a

4       document of that type previously?

5   A.  Are you --

6   Q.  Prior to July 31st, 2001, had you seen a document of

7       this type from the FBI?

8   A.  Not that I recall.

9   Q.  What is this document to you?  When you received it,

10      what does it say to you?

11  A.  It states that the prints that they received from

12      Hamilton County Sheriff's Office that he submitted

13      was prints that go to Quintin Hawkins, or identical,

14      excuse me.

15  Q.  Does that document mention anything about a Quentin

16      Haskins?

Page 33

ef112103.txt

17    A.   No, sir, the name is not on there.

18    Q.   Does the document mention anything about a Quanza

19         Hawkins?

20    A.   No, sir, the name is not on there.

21    Q.   Okay.  To your knowledge, did Huntsville Police

22         Department have any warrants for a Quintin Dante

23         Hawkins in July of 2001?

                                                            36

1     A.   On who now?

2     Q.   Quintin Dante Hawkins?

3              MR. HARMON:  Objection.  This is Mr. Harmon

4          speaking.  You may go ahead.

5              THE WITNESS:  I do not know.

6     Q.   (BY MR. RUCKER:)  Were you aware of any warrants or

7          any reason that the Huntsville Police Department was

8          looking for a Quintin Dante Hawkins in July of 2001?

9     A.   I do not know.

10    Q.   Okay.  I'm going to ask you to turn next to Exhibit

11         16.

12    A.   (Witness complies.)

13    Q.   And was Exhibit 16 part of the fax that was received

14         that was first identified with the cover sheet at

15         Exhibit 14?

16    A.   It appears to be.

17    Q.   What is the document Exhibit 16, please?

                              Page 34

ef112103.txt

18    A.   It's fingerprints on Quintin Hawkins.

19    Q.   Once again, did you know an individual by the name of

20         Quintin Hawkins on July 31st, 2001?

21    A.   As far as I know, no.

22    Q.   Were you aware that the Huntsville Police Department

23         was looking for an individual by the name of Quentin

37

1          Haskins?

2     A.   I was not aware of it until we received the teletype.

3     Q.   Okay.  I'm going to ask you next to turn your

4          attention to Exhibit 17.  Let me ask you once again

5          to identify that document, if you can?

6     A.   It's another set of fingerprints on Quintin Dante

7          Hawkins.

8     Q.   Is there anything mentioned in this document about a

9          Quentin Haskins?

10    A.   There is no name on it that says Quentin Haskins.

11    Q.   Is there anything on this document that indicates a

12         Quanza Hawkins?

13    A.   No, sir, that name is not on this document.

14    Q.   Did you, in dealing with the information regarding

15         Haskins, did you come across any physical description

16         of the subject that was being sought by the

17         Huntsville Police Department?

18    A.   There might have been one on the warrant itself.

19    Q.   And do you -- do you recall discussing, either by

Page 35

ef112103.txt

```
20        teletype or by telephone, the physical
21        characteristics of the individual by the name of
22        Quentin Haskins?
23   A.   As far as I can remember, no.
```

38

```
 1   Q.   Thank you.  When you were communicating with Stanton
 2        and/or whoever you communicated with with Hamilton
 3        County --
 4             MR. HARMON:  Objection.
 5             MR. RUCKER:  Basis?
 6             MR. HARMON:   It hasn't been established that
 7        she's communicated with them.  She said no.
 8   Q.   (BY MR. RUCKER:)  Thank you.  When you communicated
 9        with whoever you communicated with in the early
10        morning hours of July 31st and you advised them of
11        certain characteristics that you were looking for,
12        was there ever a response to your inquiries?
13   A.   As far as I can remember, when I talked to, over the
14        phone, to Hamilton County, I was just telling them
15        that we were still trying to verify that their
16        subject they had was the one we wanted, and that I
17        had already spoke to the investigator and we would be
18        trying to fax a picture.
19   Q.   When you advised them that the person had tattoos
20        that said "hard knock life," do you recall typing
```

```
                          ef112103.txt
```

21          that --
22    A.    Through the teletype.
23    Q.    Yes.  Did they ever respond to that in any way?

                                                            39

1     A.    Not on teletype, no, sir.
2     Q.    Did they ever respond to that by telephone?
3     A.    As far as I remember, no.
4     Q.    When you advised whoever you were speaking with that
5           photographs were on the way, did they ever respond in
6           any way that they were waiting on the photographs or
7           that they were looking for them?
8                 MR. LAZARUS:  Note an objection to the
9           characterization of her testimony as far as
10          photographs on the way as opposed to what she said is
11          we are going to try to send photographs.
12                MR. PITTS:  You can answer.
13                THE WITNESS:  Not that I can remember.
14    Q.    (BY MR. RUCKER:)  When you typed in the teletype that
15          fingerprints were being sought -- let me find the
16          specific teletype.  At Exhibit 5 when you stated "We
17          are attempting to get you a fingerprint class.  Have
18          you taken subject's fingerprints?  If so, please
19          advise what the class is."  Was there ever any
20          response to that teletype message?
21    A.    The only response that we received was on Exhibit
22          Number 7 saying that the FBI had confirmed the prints

ef112103.txt

23          of the individual.

                                                    40

1     Q.   Okay.  But was there ever any response to your

2          request regarding whether they had taken the

3          fingerprints of the individual and to send them to

4          Alabama?

5     A.   Not through teletype, as far as I can see.

6     Q.   Was there ever a response to any of the inquiries

7          that you made by teletype or telephone regarding the

8          identification of the person that was being held in

9          Cincinnati at the time?

10    A.   Okay.  One more time, please.

11              MR. RUCKER:  I'm not sure.  Could you read

12         that back, please?

13              (Reporter read requested testimony.)

14              THE WITNESS:  Okay.  I don't understand.  Are

15         you saying -- I don't understand what you mean.  I'm

16         sorry.

17    Q.   (BY MR. RUCKER:)  Okay.  They didn't respond to the

18         inquiry about the fingerprints, correct?

19    A.   Okay.  They did fax a copy of the fingerprints.  As

20         far as through teletype, no.

21    Q.   Okay.  They didn't respond when you advised that

22         there was a tattoo on the particular individual you

23         were searching for?

                          Page 38

ef112103.txt

41

1    A.  Not through teletype.

2    Q.  They didn't respond -- when you advised that Rex

3        Reynolds was sending a photograph --

4            MR. LAZARUS:  I'm going to object again.  I

5        don't know if I got cut off last time, but I don't

6        believe the testimony suggests that Rex Reynolds was

7        sending a photograph.  I believe the testimony has

8        been they were going to try to get a photograph.

9            MR. RUCKER:  All right.  Could you turn to

10       Exhibit 9, Steve, please.

11           MR. LAZARUS:  Nine?

12           MR. RUCKER:  Yes.

13           MR. LAZARUS:  Go ahead.

14   Q.  (BY MR. RUCKER:)  Do you have Exhibit 9 in front of

15       you, please?

16   A.  Yes, I do.

17   Q.  Does that indicate there that you typed the "Please

18       be advised that Investigator Rex Reynolds is faxing

19       your department a photo of Quintin Hawkins"?

20   A.  Yes.

21   Q.  All right.  Did anyone in Cincinnati ever respond to

22       that message that you sent about the fact the

23       photograph was being faxed?

ef112103.txt

42

1   A.   No, sir.

2   Q.   Did anyone in Cincinnati ever respond to the message

3        that he will be phoning your department concerning

4        the subject?

5   A.   No, sir.

6            MR. HARMON:  Objection.  We need to clarify.

7        Are you saying did anybody ever respond by teletype?

8        Did anybody respond by telephone call?  Did anybody

9        ever respond by fax, by any other method?  This is

10       Mr. Harmon objecting.

11           MR. RUCKER:  Okay.  I asked if there was ever

12       any response.  If there was no response, it couldn't

13       have been by any means.  You can ask her, I guess, on

14       follow-up questions if you like.

15  Q.   (BY MR. RUCKER:)  How did this communication -- well

16       strike that.  After the communication, did you

17       subsequently speak with who's now Lieutenant Reynolds

18       regarding the communication that you had with persons

19       in Cincinnati the night before?  That's a long

20       question.

21  A.   Okay.  Had I talked to him?

22  Q.   After the message was ended, after you were off your

23       shift?

ef112103.txt

43

1    A.   No, sir.

2    Q.   Okay.  Were you asked at some point to draft a memo

3         about your conversation with Officer Stanton and any

4         Hamilton County officials after the conversation

5         ended?

6    A.   No, sir.

7              MR. LAZARUS:  Objection to the question.

8         Assumes facts not in evidence.

9    Q.   (BY MR. RUCKER:)  Okay.  I'm going to point your

10        attention to an exhibit that's been previously

11        marked, if I can find it.  It's been marked as

12        Exhibit 18.  I know it's somewhere around here.

13        Okay. It's Exhibit 18.

14             MR. HARMON:  Do you all have that in front of

15        you?

16             MR. HARMON:  No.

17             MR. RUCKER:  Okay.  I see what I did wrong.  I

18        faxed you all the documents that she -- well, I

19        represent to you that Exhibit 18 is a memo from

20        Esther Funk dated, excuse me, 8/3/2001.  It appears

21        to be a computer printout.  Begins "On 7/31/2001 I

22        received a hit request."  That document has been

23        previously provided to the parties in discovery.  I

ef112103.txt

44

 1        don't have that -- I thought I made extra copies of
 2        it.  Apparently I made it as an exhibit and didn't
 3        make copies of it or fax it to you.  But that is
 4        marked as Exhibit 18.
 5    Q.  (BY MR. RUCKER:)  If you could take a moment to read
 6        through that document.
 7                MR. HARMON:  We're looking for it right now to
 8        see if we have it.  We ask that you wait until we
 9        find it.  Please bear with me.
10                MR. RUCKER:  Sure.
11                MR. PITTS:  It's titled "Supplemental Report"
12        at the top.
13                MR. HARMON:  It's like a teletype?
14                MR. RUCKER:  No.  To help out on this, it has
15        Huntsville Police Department -- the document I gave
16        to you probably said or probably had a fax date and
17        number on there of September 19th, 2001, 1411, City
18        Attorney Office.  It's page 11 of 23.
19                MR. HARMON:  I see some stuff I inherited.
20        Would it have a Bates number on it?
21                MR. RUCKER:  It should have.  It was one of
22        the documents I provided very early.
23                MR. HARMON:  I see some stuff that has Bates

45

ef112103.txt

```
 1        numbers on it.  The first one is that memo signed by
 2        somebody named Dick, that handwritten note.  Maybe
 3        it's in there.
 4             MR. RUCKER:  It probably is.
 5             MR. HARMON:  That looks like stuff that came
 6        from -- I'm sorry, guys.
 7             MR. RUCKER:  It would be somewhere in the
 8        neighborhood of the photographs.
 9             MR. HARMON:  It vaguely sounds familiar to me.
10             MR. RUCKER:  About 15 lines, single-spaced.
11             MR. HARMON:  Okay.
12             MR. RUCKER:  Got it?
13             MR. HARMON:  I've got it.  By the way, it's
14        Bates Number H00043.
15             MR. RUCKER:  Thank you.
16    Q.  (BY MR. RUCKER:)  Referring your attention to Exhibit
17        18; do you recognize this document?
18    A.  Yes, it's a supplement report that I made concerning
19        the teletypes.
20    Q.  And a supplement, when you say supplement report,
21        what was it supplementing?
22    A.  It was supplementing the case where the warrant,
23        where the warrant was actually from.
```

46

```
 1    Q.  Okay.
```

ef112103.txt

2    A.   Or stems from.

3    Q.   All right.  So what process did you go through to

4         make this supplement?  What's the purpose of the

5         supplemental warrant, supplemental information,

6         excuse me?

7    A.   The purpose of a supplement is to actually tell, as

8         far as you can remember, what was said during the

9         teletypes that were sent.

10   Q.   Okay.  And so the information in this document -- if

11        you could -- I understand the document speaks for

12        itself, but could you read into the document, could

13        you read into the record what the document says,

14        please?

15   A.   "On 7/31/2001 I received a hit request from

16        Cincinnati, Ohio PD" --

17   Q.   Hold on one second.  She's taking everything down.  I

18        know it's being videotaped, but if you could go at a

19        pace that she can record this, please.

20   A.   "On our entry for wanted person, Quentin Haskins,

21        Cincinnati PD stated that they believed that they had

22        this subject but under an AKA that had been entered

23        into NCIC as Quintin Hawkins, date of birth, 8/18 of

47

1         '80.  I informed Ohio that we were trying to confirm

2         if they had the same subject we had entered into

ef112103.txt

```
 3          NCIC.  I also advised Cincinnati P. D. that we did
 4          hold active warrants on Quentin Haskins, and that
 5          this department would extradite.  Also I advised them
 6          that Investigator Reynolds would be contacting their
 7          agency to get picture and to make a positive ID on
 8          their subject.  I received a tele --" correction, "I
 9          received a TTY from Ohio stating that the FBI had
10          confirmed that this subject was the same subject we
11          had entered into NCIC.  On 8/1/2001, 08:30, Hamilton
12          County SO sent a teletype to this agency stating that
13          that subject had signed a waiver and needed to be
14          picked up by this department by or on or before
15          8/14/2001.  A teletype was sent back advising that
16          Investigator Rex Reynolds would be in touch with
17          their department for extradition information on
18          Quentin Haskins.  Subject was cleared NCIC."
19     Q.   Thank you.  And is this document and the information
20          that you -- was this typed into the computer?
21     A.   Yes, sir.
22     Q.   And was the information that you typed into the
23          computer a fair and accurate representation of what
```

48

```
 1          you recall had occurred regarding your communication
 2          about Quentin Haskins?
 3     A.   Right.
 4     Q.   Okay.  And is it true, there was more things that
```
                              Page 45

ef112103.txt

```
 5        happened during the course of July 31st, 2001
 6        regarding Quentin Haskins; is that true?
 7   A.   I don't remember, but it probably did.
 8   Q.   This was a summary of what you recall?
 9   A.   Yes, sir.
10   Q.   And you indicate a supplemental to the file.  Did you
11        give this document to anyone else?
12   A.   No, sir, you just type it into the I-LEADS case.
13   Q.   Based on your knowledge, personal knowledge of the
14        facts and your knowledge of procedures with regard to
15        information in the computer, who do you believe is
16        responsible, who is the source for the incarceration
17        and transportation of Quintin Hawkins to Alabama on
18        the murder warrant for Quentin Haskins?
19             MR. HARMON:  Objection.  This is Mr. Harmon
20        objecting.
21             THE WITNESS:  I do not know.
22   Q.   (BY MR. RUCKER:)  In your prior experience, had you
23        ever encountered an incident where a police agency
```

49

```
 1        confirmed and sent an individual who did not match
 2        the physical characteristics of the person who was
 3        identified on a warrant or on another information?
 4             MR. HARMON:  Objection.  Mr. Harmon here.  You
 5        may answer.
```

Page 46

ef112103.txt

```
 6              THE WITNESS:  Not that I can recall.
 7    Q.  (BY MR. RUCKER:)  Did you discuss this matter with
 8        any person in the Huntsville Police Department prior
 9        to yesterday?
10    A.  I talked with the city attorney.
11    Q.  Okay.  Did you speak to any other clerks, any other
12        police officers about this matter?
13    A.  No, sir.
14    Q.  At sometime after August 3rd, 2001, did you discover
15        that the person that was sent from Cincinnati was not
16        the person who was identified in the warrant in
17        Huntsville?
18    A.  No, sir.
19    Q.  Do you know that to this day, that the person that
20        was sent from Cincinnati was not the person
21        identified on the warrant?
22    A.  I have heard things.
23    Q.  When was it that you may have heard that, if you
```

                                                      50

```
 1        recall?
 2    A.  I don't know.
 3    Q.  Would that have been sometime a couple of years ago?
 4    A.  I don't know.  I do not remember.
 5    Q.  All right.  That's all the questions I have
 6        specifically on this, on these issues, but I do have
 7        a couple of housecleaning items I need to put on the
```

ef112103.txt

```
 8        record.  Did you review any documents to prepare for
 9        this deposition?
10   A.   I reviewed the teletypes.
11   Q.   Okay.  And those are the documents that we've
12        discussed here this afternoon?
13   A.   Yes, sir.
14   Q.   And did you meet with anyone to discuss your
15        testimony, anyone other than your attorney?
16   A.   No, sir.
17   Q.   Are you familiar with a person by the name of Michael
18        Harmon?
19   A.   No, sir.
20   Q.   Steve Lazarus?
21   A.   No, sir.
22   Q.   To your knowledge, have you ever spoken by phone with
23        either of those individuals?
```

                                                        51

```
 1   A.   No, sir.
 2   Q.   How did you receive notice of this deposition?
 3   A.   I received a subpoena.
 4   Q.   How was it given to you?  How did you receive it?
 5   A.   When I came in to work Tuesday night, it was on my
 6        desk.
 7   Q.   You reported to work on Tuesday night.  Would that
 8        have been November the 18th?
```

ef112103.txt

9   A.  If that was Tuesday night.

10  Q.  Okay.  Were you handed the subpoena by a person known

11      as Steve Grimes?

12  A.  The subpoena was laying on my desk when I came in

13      third shift.

14  Q.  And so, in fact, you were not present on the morning

15      hours of November 18th, 2003, for the subpoena to

16      have been personally served on you; is that correct?

17  A.  No, sir.

18          MR. RUCKER:  That's all the questions I have.

19

20      EXAMINATION BY MR. HARMON:

21  Q.  Ms. Funk, my name is Mike Harmon. I'm an attorney for

22      the City of Cincinnati, and I have a few questions I

23      wanted to ask you.  Before we get started, do you

52

1       need to take a break?  Would you want to get a drink

2       of water or do you need to break for any reason or

3       should we go ahead?

4   A.  No, I'm fine.

5           MR. HARMON:  Okay.  Thank you.  Anybody else

6       need a break?

7           MR. RUCKER:  No.

8           MR. PITTS:  We're good.

9   Q.  (BY MR. HARMON:)  Ma'am, would you please take a look

10      at Exhibit Number 2?

ef112103.txt

11   A.   (Witness complies.)  Okay.

12   Q.   And I just want to clarify a couple of answers that

13        you gave when Mr. Rucker was asking you questions.

14        Calling your attention to your own handwriting in the

15        lower half of Exhibit Number 2 where the words

16        "district" or "dist 2" underlined are written, and

17        then it says "P470," officer or "Off Stanton."  Now,

18        I believe you indicated that you wrote those words in

19        your handwriting; is that correct?

20   A.   Yes, sir.

21   Q.   And I believe that you indicated you wrote those

22        words in your handwriting because somebody told you

23        that's who you needed to talk to in Cincinnati?

53

1    A.   I don't remember.  I know that that is in my

2         handwriting.

3    Q.   But you really don't know if you wrote those words

4         because you were just noting who you were going to

5         try to reach later or you wrote them because you

6         actually talked to somebody that you thought was that

7         person?  Do you understand my question?

8    A.   I don't remember.

9    Q.   But you don't really know whether you actually talked

10        with Officer Stanton?

11   A.   I can't recall who I talked to.  I know I did talk to

Page 50

ef112103.txt

12          an officer who they stated was in charge of this.

13    Q.    You don't know whether it was a supervisory sergeant

14          over Officer Stanton or not, right?

15    A.    I do not remember.

16    Q.    Do you even know if you were talking to a Cincinnati

17          police officer or member of the sheriff's department?

18    A.    I don't remember.

19    Q.    Now, ma'am, I notice that on a lot of these exhibits,

20          for example, Exhibit 1, Exhibit 2, they have, up at

21          the top of those exhibits, there are two times of

22          day.  And I know that you talked, and in your answers

23          to questions from Mr. Rucker you mentioned that you

                                                            54

1           thought one of those numbers would be the number that

2           the message was actually sent from, the source of the

3           message, and the other number would be the time that

4           it was actually received in your office in

5           Huntsville; is that correct?

6     A.    Correct.  I believe at the very top on Exhibit 2, the

7           very top number or -- correction, time, 05:08 is the

8           time that we received it.

9     Q.    Okay.  Now, calling your attention to your, let's say

10          Exhibit Number 4, then.  Now I notice at the top of

11          that exhibit there's only one time.  I see 5:19 a.m.

12          Do you see that?

13    A.    Yes, sir.

                        Page 51

ef112103.txt

14    Q.   Do you know when that -- is that the time that was
15        sent from your office?
16    A.   As far as I can tell from this teletype, yes, sir.
17    Q.   So you don't know when it was received in Cincinnati,
18        Ohio?
19    A.   No, sir.
20    Q.   And the same -- let's go look at Exhibit Number 3.
21        And up at the top it's got 3:19 a.m. So I take it
22        that would be a record of when you sent something
23        out, but you don't know when it was received in Ohio?

55

1    A.   I believe at the time that we sent it out was the
2        very top time, which was cut off.
3    Q.   So that is missing. I see. That's missing. Okay.
4        Do you know if there is a better copy of that exhibit
5        available that might show the top?
6    A.   No, sir, I don't know. I'd have to go back to the
7        originals.
8    Q.   Would you be so kind -- if you get a chance to check
9        and see if there is an original that has the top,
10       would you be so kind as to refer it to your counsel
11       who's there today and ask him if he would provide it
12       to me?
13    A.   Yes, sir.
14    Q.   Thank you. And provide it, of course, to Mr. Rucker

ef112103.txt

15          as well.  Now, I know that Mr. Rucker was asking you
16          whether the Cincinnati Police ever responded, or
17          Cincinnati, let's say, ever responded to your
18          departmental request for fingerprints.  And is it
19          correct to say that Exhibit 16 and 17 is a response
20          to your department's request for fingerprints?
21                MR. RUCKER:  Objection.  Go ahead and answer.
22                THE WITNESS:  On Exhibit 16 and on Exhibit 17
23          we were faxed with fingerprints.

                                                              56

1     Q.    (BY MR. HARMON:)  They were faxed to you from the
2           Hamilton County Sheriff's Office or let's say HCSO?
3     A.    It appears they were faxed from Hamilton County SO.
4     Q.    Okay.  Now, with regard to exhibit, I'm actually
5           going to say Exhibits 15, 16, 17, that appears to be
6           that fax that we think is misdated.  That's the
7           four-page fax that was sent CC to you, Esther, that
8           is dated July 30th, but we think it really was
9           misdated.  At the very top of that exhibit -- you
10          know how faxes are.  Usually there is a legend at the
11          top or one of the corner ends of the fax there is a
12          legend that tells you the time of day and the day and
13          the year and so forth that it was faxed to your
14          office.  Does your copy show that?
15    A.    No, sir, my copy does not show that at the top.
16    Q.    Mine does not either.  Okay.  So we really don't know
                        Page 53

ef112103.txt

17    when that was received, but you presume it was
18    received July 31st sometime?
19  A.  Either July 30th or -- I'm not sure.
20  Q.  Okay.  Once again, if there is an opportunity to
21    double check, if you've got original records
22    somewhere in your office, if you could check and see
23    if those original records contain that additional

57

1    print that's not on the copies we have, I'd really
2    appreciate it, and give them to Mr. Pitts and he can
3    provide them to the counsel in this case?
4  A.  Yes, sir.
5  Q.  Thank you.  Now, did you notice -- if you'll look at
6    Exhibit 16 and Exhibit 17, those are copies of
7    prints, right?
8  A.  Yes, sir.
9  Q.  And actually they're not, weren't taken on the same
10    day, were they?
11  A.  One was taken on 7/31/2001.  That was Exhibit 16.
12  Q.  Yes.
13  A.  Exhibit 17, the prints were taken on 6/27/96.
14  Q.  So it appears the city of Cincinnati had Mr. Quintin
15    Hawkins in their custody on two separate occasions?
16        MR. RUCKER:  Objection.
17  Q.  (BY MR. HARMON:)  And that then when he was taken to

ef112103.txt

```
18        the sheriff's office in the City of Cincinnati on

19        those dates, I mean, you'll notice Exhibit 17 says,

20        in the upper right-hand corner, or upper left-hand

21        corner it says "Ham Co."  Hamilton County.

22             MR. RUCKER:  Objection.

23   Q.   (BY MR. HARMON:)  Exhibit 16 says, at the top it's
```

58

```
1         got "contributor," and it's got "sheriff's office,

2         Cincinnati, Ohio."  But you'll notice that on two

3         separate dates Mr. Hawkins's prints were taken in

4         Ohio; is that correct?

5              MR. RUCKER:  Objection.

6    Q.   (BY MR. HARMON:)  You may answer.

7    A.   It appears from the dates that these were taken on

8         two separate dates.

9    Q.   And the Exhibit 16, if it's dated July 31st, '01,

10        then it's likely it really couldn't have been faxed

11        to Huntsville to your office on July 30th of that

12        year?

13             MR. RUCKER:  Objection.  Go ahead and answer

14        if you can.

15             THE WITNESS:  I would assume.

16   Q.   (BY MR. HARMON:)  Now, do you know if your department

17        ever took these two copies of prints that were faxed

18        down from Cincinnati, did you ever take them or do

19        you know if anybody ever compared them with the
```

ef112103.txt

20      prints that you had of your wanted man down in

21      Huntsville?

22  A.  As far as I was aware, we did not have fingerprints

23      on our subject.


                                                    59

1   Q.  Okay.  Now, calling your attention to Exhibit

2       Number 2.

3   A.  All right.

4   Q.  And that's the request from Ohio, and that says in

5       there, is this correct, "we request you send a copy

6       of fingerprints."  You don't even know if you guys

7       had a set of fingerprints at that time for your

8       wanted person; is that correct?

9   A.  At the time we received this message, no.

10  Q.  So as far as you know, you were never able to respond

11      to that request from Ohio?

12  A.  I responded to that request by telling them that we

13      were going to confirm their teletype within one hour.

14  Q.  And what happened within one hour; do you know?

15  A.  On Exhibit Number 5, I sent a teletype telling them

16      that we were attempting to get a copy of the

17      fingerprint class for the subject and also stated in

18      there that subject had a tattoo on upper right arm of

19      "hard knocks of life."

20  Q.  Okay.  Now, your request in Number 5 was a request

                        Page 56

ef112103.txt

21     for Ohio to send you a fingerprint request, correct?

22  A.  Yes, sir, I asked had they taken fingerprints.

23  Q.  And then would Exhibit 16 and 17 be a response to

60

1      that request?

2   A.  We did receive a fax with fingerprints.

3   Q.  Okay.  Now, do you know what happened to that fax

4      with the fingerprints?  Do you know who it was given

5      to?  Was it received at your office?

6   A.  I don't remember.

7   Q.  Now, do you know for a fact whether or not your

8      department, anybody in your department was ever able

9      to provide Ohio with a legible photograph of your

10     wanted person?

11  A.  I have no knowledge.

12         MR. HARMON:  I have no further questions at

13     this time.  I thank you very much.

14

15  EXAMINATION BY MR. LAZARUS:

16  Q.  Yes, this is Steve Lazarus.  I just had a couple of

17     things.  I don't know if you would understand or help

18     explain this.  On Exhibit 15, and is that the one

19     that's got the seal it on it from the FBI there?

20  A.  Yes, sir.

21  Q.  I'm sorry.  Do you see that?

22  A.  Yes, sir.

ef112103.txt

23    Q.  Down toward the bottom in capital letters it's got

61

1         "Wanted, check NCIC."  Do you see that?

2    A.   Yes, sir.

3    Q.   What does that mean?

4              MR. RUCKER:  Objection.  Go ahead.

5              THE WITNESS:  I do not know.

6    Q.   (BY MR. LAZARUS:)  Okay.  What it is, I think you

7         talked earlier what the NCIC was.  Do you know what

8         that is?

9    A.   The NCIC is a nationwide computer that all agencies

10        use to teletype each other for information from the

11        states.

12   Q.   Okay.  And on Exhibit Number 10 -- tell me when you

13        get to that.

14   A.   All right.

15   Q.   Indicates there that the second sentence says, "He is

16        cleared through NCIC, thanks."

17   A.   Yes.

18   Q.   Do you know what that means?

19   A.   I assume that that operator meant that she cleared

20        that subject's name out of NCIC.

21             MR. LAZARUS:  Okay.  That's all I have.  Thank

22        you.

23             MR. HARMON:  I have one more, and I'm going to

Page 58

ef112103.txt

62

1      ask your indulgence, Mr. Rucker, on this one.  Are
2      you there?
3              MR. RUCKER:  Yes.
4              MR. HARMON:  If we go to what I think is
5      Exhibit 15, and I'm actually going to ask not so much
6      a question of the witness right now.  It's for all
7      the counsel and all the parties here, because we're
8      trying to clarify the exact time frame in which the
9      Hamilton County Sheriff sent that four-page fax CC to
10     Esther.  And I just noticed at the very top of our
11     copy that you sent us of Number 15, in the far upper
12     right you can barely make it out, but I see t-u-e,
13     Tuesday, then I see 7:31, kind of broken up, and then
14     I see something that says 5:32.  You guys see that?
15             MR. RUCKER:  Mike, your eyes are much better
16     than mine, and I'm not happy about that.  I see
17     something.
18             MR. HARMON:  Well, I have bifocals.  It's not
19     my eyes.  I thought we could all agree that we, you
20     know, we could stipulate that this fax came from the
21     Hamilton County Sheriff to Huntsville on Tuesday,
22     July 31st, at 5:32 a.m. in the year 2001.  I'll just
23     leave it at that.  That's not so much a question,

ef112103.txt

63

```
 1      really, so I'm done.  Thank you.

 2

 3      FURTHER EXAMINATION BY MR. RUCKER:

 4   Q.  I had about one or two follow-up questions.

 5      Mr. Harmon asked you about whether these fingerprints

 6      that were faxed were a follow-up to your request for

 7      them to send the fingerprints or asking whether the

 8      fingerprints had been taken.  Is it fair to say,

 9      based on the documents that were received, that these

10      fingerprints came after there had already been

11      confirmation from the FBI that the person in custody

12      in Cincinnati was Quintin Dante Hawkins?

13   A.  I'm not sure.

14   Q.  Okay.

15   A.  I'm not sure if the faxes came all at the same time

16      or not.

17   Q.  Do you recall if there were any phone calls coming in

18      to Huntsville on that night or was it the incoming

19      communication by teletype?

20   A.  I don't remember any phone calls coming in.

21   Q.  Do you recall if there was any problems with the

22      phones that night?

23   A.  I don't remember.
```

ef112103.txt

64

```
 1   Q.   Do you recall if you all were short-staffed or
 2        something?
 3   A.   I do not remember.
 4   Q.   Was there anything unusual about the hours that you
 5        all were operating that particular night?
 6   A.   I do not remember.
 7   Q.   But there was nothing unusual about the night that
 8        causes you to recall that for some reason nobody was
 9        there to receive phone calls?
10   A.   Oh, no, I'm sure there's people there all the time to
11        receive phone calls.
12   Q.   And the phone numbers that you provided on these
13        teletypes, to the best of your knowledge and what
14        they look like today, were those the accurate phone
15        numbers that would have made it able to reach
16        somebody in the records division where you were --
17   A.   Yes, sir.
18   Q.   -- on that particular night?
19             MR. HARMON:  Objection.  You may answer.
20             THE WITNESS:  Yes, sir.
21   Q.   (BY MR. RUCKER:)  And so if someone states that they
22        called that number several times over several hours
23        and were unable to reach somebody, you wouldn't know
```

ef112103.txt

65

1    how that would be; is that correct?

2  A.  No, I would not know how that would be.

3  Q.  Because somebody was there to receive phone calls,

4    correct?

5  A.  Yes, sir.

6          MR. RUCKER:  No further questions.

7          MR. PITTS:  No questions from me either.

8          MR. HARMON:  No further questions from the

9    City of Cincinnati.

10          MR. GRIFFIN:  This is the end of this

11    deposition, 2:45 p.m.

12                FURTHER THE DEPONENT SAITH NOT.

13                (EXHIBITS ATTACHED AND ENCLOSED.)

14

15

16

17

18

19

20

21

22

23

ef112103.txt

66

1                    C E R T I F I C A T E

2

3   STATE OF ALABAMA

4

5   MADISON COUNTY

6

7           I hereby certify that the above and foregoing

8   deposition was taken down by me in stenotype and the

9   questions and answers thereto were reduced to writing

10  under my supervision, and that the foregoing

11  represents a true and correct transcript of the

12  testimony given by said witness on said occasion.

13          I further certify that I am neither of

14  counsel nor of kin to the parties to the action, nor

15  am I in any way interested in the result of said

16  cause.

17

18

19

20                          MELANIE REAGAN STRANGE

21                             COURT REPORTER

22

23