kp112103.txt

1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION


QUINTIN HAWKINS,

      Plaintiff,

vs.                                    CASE NO.

THOMAS STANTON, et al.,                C-1-01-783

      Defendants.


DEPOSITION OF:  KATHY PIERCE

Videographic deposition of KATHY PIERCE, taken pursuant to Notice, before Melanie Reagan Strange, Court Reporter and Notary Public, State of Alabama at Large, in the Ramada Inn, Huntsville Airport East, 8716 Madison Boulevard, Huntsville, Alabama, on the 21st day of November, 2003, commencing at 12:08 p.m. pursuant to the stipulations set forth herein.


Melanie Reagan Strange, Court Reporter

kp112103.txt

2

```
 1                  S T I P U L A T I O N S
 2            IT IS HEREBY STIPULATED AND AGREED, by and
 3       between counsel that the videographic deposition of
 4       KATHY PIERCE may be taken on the date and time
 5       specified and in the action denominated herein before
 6       Melanie Reagan Strange, Court Reporter and Notary
 7       Public.
 8            IT IS FURTHER STIPULATED AND AGREED that the
 9       signature to and reading of the deposition by the
10       witness is waived, the deposition to have the same
11       force and effect as if full compliance had been had
12       with all laws and rules of Court relating to the
13       taking of deposition.
14            IT IS FURTHER STIPULATED AND AGREED that it
15       shall not be necessary for any objections to be made
16       by counsel to any questions, except as to form or
17       leading question, and that counsel for the parties
18       may make objections and assign grounds at the time of
19       trial or at the time said deposition is offered on
20       evidence, or prior thereto.
21            IT IS FURTHER STIPULATED AND AGREED that
22       notice of filing of this deposition by Commissioner
23       is waived.
```

3

kp112103.txt

```
 1                    A P P E A R A N C E S

 2

 3        APPEARING ON BEHALF OF THE PLAINTIFF:

 4                Mr. Fanon A. Rucker
                  Attorney at Law
 5                Santen & Hughes
                  312 Walnut Street
 6                Suite 3100
                  Cincinnati, Ohio   45202
 7

 8        APPEARING (via telephone) ON BEHALF OF THE DEFENDANT:

 9                Mr. Michael J. Harmon
                  Senior Assistant Trial Counsel
10                City of Cincinnati
                  801 Plum Street
11                Room 214
                  Cincinnati, Ohio   45202
12

13                Mr. Stephen S. Lazarus
                  Attorney at Law
14                Hardin, Lefton, Lazarus & Marks, LLC
                  915 Cincinnati Club Building
15                30 Garfield Place
                  Cincinnati, Ohio   45202
16

17        APPEARING ON BEHALF OF THE CITY OF HUNTSVILLE:

18                Mr. M. Bruce Pitts
                  Assistant City Attorney
19                City of Huntsville
                  P. O. Box 308
20                Huntsville, Alabama   35810

21

22        ALSO PRESENT:

23                Mr. Don Griffin, videographer
```

                                                       4

```
 1                    I N D E X
                       Page 3
```

kp112103.txt

2                    WITNESS:  KATHY PIERCE

3                                                PAGE

4        Examination by Mr. Rucker                6-25

5

6        Reporter's Certificate of Completion        27

7        ---------------------------------------------------

8                        INDEX OF EXHIBITS

9

10        PLAINTIFF'S EXHIBITS:                    MARKED

11

12        PX-1                                    12

13        PX-2                                    12

14

15

16

17

18

19

20

21

22

23

                                                5

1        11/21/03              PROCEEDINGS        12:08 p.m.

2                    MR. GRIFFIN:   On the record, 12:08, November

kp112103.txt

3        21st, year 2003.  This is this deposition of Ms.
4        Kathy Pierce.  This deposition is taking place in
5        Huntsville, Alabama at the Ramada Inn Airport.  At
6        this time, would the attorneys identify themselves,
7        starting with the Plaintiff's attorney.
8              MR. RUCKER:  Fanon A. Rucker with Santen &
9        Hughes.  I am the lawyer for Quintin Hawkins, the
10       Plaintiff, in Quintin Hawkins versus Thomas Stanton,
11       et al.
12             MR. GRIFFIN:  Would the attorneys on the
13       telephone identify themselves?
14             MR. HARMON:  Yes.  This is Michael, middle
15       initial, J. Harmon, H-a-r-m-o-n, Senior Assistant
16       Trial Counsel for the City of Cincinnati, attorney
17       for the City of Cincinnati and the three Cincinnati
18       police officers who were named in this suit.
19             MR. LAZARUS:  And this is Steve Lazarus,
20       attorney, special counsel for the officers in their
21       individual capacity also in Cincinnati, Ohio.
22             MR. PITTS:  And this is Bruce Pitts.  I'm an
23       assistant city attorney with the City of Huntsville.

                                                        6

1              MR. GRIFFIN:  Ms. Court Reporter, would you
2        swear the witness, please?
3                          KATHY PIERCE,
4        being first duly sworn, was examined and testified as
                              Page 5

kp112103.txt

5     follows:

6

7     EXAMINATION BY MR. RUCKER:

8  Q.  Ms. Pierce, to re-introduce myself, my name is Fanon

9     Rucker, and I'm representing Quintin Hawkins in the

10     matter that we are discussing today.  Have you ever

11     had your deposition taken before?

12  A.  Yes, I have.

13  Q.  So you know that the court reporter is going to be

14     taking down everything that you say, so that I'd ask

15     that any response that you give be a verbal response.

16     It's difficult for her to take down head nods and

17     head shakes, although this is being videotaped.  If

18     you have any questions of the questions that I ask

19     you, please just let me know and I'll try to restate

20     the question clearer.  If you need to take a break,

21     please let me know.  I don't expect this deposition

22     will last very long, but sometimes I tend to talk a

23     little more than I need to.  So I'm going to first

7

1     ask you to state your name and spell your last name

2     for the record?

3  A.  I'm Kathy Pierce, P-i-e-r-c-e.

4  Q.  And what is your employment, current employment?

5  A.  I'm an investigator with the Huntsville Police

kp112103.txt

6      Department.

7   Q.   And how long have you been so employed?

8   A.   21 years.

9   Q.   Is it true then you were in that position in July and

10       August of 2001?

11  A.   Yes, I was.

12  Q.   In July and August of 2001, who was your supervisor?

13  A.   Sergeant Rex Reynolds.

14  Q.   And is he now a Lieutenant with the Huntsville Police

15       Department?

16  A.   Yes, he is.

17  Q.   And what types of cases did you investigate in July

18       and August of 2001?

19  A.   Murder cases, suicide and adult sex crimes,

20       unattended deaths.

21  Q.   And was this known as the major crimes investigation

22       section?

23  A.   Yes.

8

1   Q.   And approximately how many open cases did you have in

2        July and August of 2001?

3   A.   I don't have a clue.

4   Q.   Okay.  Was one of those open cases a person by the

5        name of Quentin Haskins?

6   A.   Yes.

7   Q.   And were there other names that you -- in August of

Page 7

kp112103.txt

```
 8       2001, were there other names by which the person
 9       Quentin Haskins was known to you?
10   A.  Yes.
11   Q.  What were some of those other names, please?
12   A.  The first name that I had was Q, just the letter Q.
13       Then a name that we had before that he'd given us on
14       a prior arrest was Quanza O'Neill Hawkins.
15   Q.  At the time, did you know Mr. Haskins to be known by
16       Quintin Hawkins, Q-u-i-n-t-i-n?
17   A.  Say that again, please.
18   Q.  At the time, in July or August of 2001, did you know
19       Mr. Haskins to be, to also have an alias name of
20       Quintin, Q-u-i-n-t-i-n, Hawkins, H-a-w-k-i-n-s?
21   A.  I had knowledge it was Quanza O'Neill Hawkins that
22       I'm familiar with.
23   Q.  What was the nature of your knowledge of Mr. Haskins?
```

```
                                                            9

 1   A.  He was a murder suspect in a case that I was working.
 2   Q.  And --
 3            MR. HARMON:  Please interrupt here and ask
 4       the person to speak a little louder.
 5            MR. RUCKER:  Thank you.
 6            MR. HARMON:  Thank you.
 7   Q.  (BY MR. RUCKER:)  What was the general nature of the
 8       facts of that incident involving Mr. Haskins?
```

Page 8

kp112103.txt

```
 9   A.   I had a situation on May the 18th of '01.  There was
10        a barbecue.  A female was insulted by a friend of Mr.
11        Haskins.  The female called her brother, Kurantiya
12        Garner, to come take up her cause.  He brought some
13        friends with him.  They proceeded to look for Haskins
14        and his friend.  After some time, they did locate
15        him.  There was a struggle, gunshot.  Kurantiya
16        Garner, of course, died, and at that point, talking
17        to witnesses, I received information the subject's
18        name was Q that had done the shooting.
19   Q.   And through your investigation, did you obtain a
20        physical description of the subject?
21   A.   Yes, I did.
22   Q.   What was that physical description, if you have it?
23        And for the record, you're referring to a document
```

                                                         10

```
 1        that you have in front of you?
 2   A.   Yes.
 3   Q.   I don't intend to introduce that document into
 4        evidence, but for the record, could you describe the
 5        document that you're referring to right now?
 6   A.   Yes.  It's my case report, my offense incident report
 7        that I'm looking through.
 8   Q.   And does looking at that document help to refresh
 9        your recollection as to the physical description of
10        the person who you believe to be Quentin Haskins that
```

kp112103.txt

11    you received during your investigation?
12  A.  Yes.
13  Q.  Thank you.
14  A.  It was a black male, around 22 so years of age,
15      around six foot tall.  I don't have the exact -- I
16      can't find the exact page with that information on
17      it.
18  Q.  Did you receive any information about the
19      individual's skin complexion?
20  A.  I can't recall that at the time.
21  Q.  Did you receive any information regarding identifying
22      scars or marks?
23  A.  Not at that time.  I later did.

                                                    11

1   Q.  And when was the later, relative to the issuing of
2       the arrest warrant?
3   A.  The warrant was issued -- from the initial Q, I found
4       out the subject that we had in our computer system
5       was Quanza O'Neill Hawkins.  I did a photo lineup and
6       he was identified from that lineup.  After that time,
7       a warrant was issued in that name.  After that time,
8       in communication with a police department, a
9       sheriff's department in Virginia, I determined that
10      his real name was Quentin O'Neill Haskins.  And I got
11      an identifying mark, a tattoo, that was given to me

kp112103.txt

12    by them.

13    Q.    Now, the information that you received regarding Mr.

14          Haskins, did you communicate that information to any

15          clerks or anyone to input into a computer?

16    A.    That information was given, all the information that

17          I had was given to our records people.

18    Q.    And do you know what they do or what they did with

19          that information?

20    A.    No, I don't know what they did.

21    Q.    And based on your investigation, you indicate that a

22          warrant was issued for Mr. Haskins arrest?

23    A.    Yes, it was.

12

1    Q.    I'm going to show you what's been previously marked

2          as an exhibit and will be marked in this deposition

3          as Exhibit 1.  I'm going to also show you a document

4          that's going to be marked as Exhibit 2.

5                MR. RUCKER:  For the record, I'm showing the,

6          I guess the back page of the warrant.  There is a

7          date of August 7, 2001.  I think I just faxed it to

8          you all.  State of Alabama versus, handwriting,

9          Quentin Haskins.  DOB 8/18/78, and there's alias.

10          And I ask that be marked as Exhibit 1.  And there's

11          also a document, on the front page, it's a two-page

12          document, stapled.  The first page says

13          "Certification, State of Alabama, County of Madison,

Page 11

kp112103.txt

```
14        I, Lieutenant Sherry Jackson, hereby certify that I
15        am custodian of Records."  The second stapled page is
16        a document indicating "entered leads, warrant Madison
17        County."  It has the warrant number and other
18        information on this case.  That's going to be Exhibit
19        2.
20             (Whereupon, Plaintiff's Exhibit Numbers
21              1 and 2 were marked for identification.)
22   Q.  (BY MR. RUCKER:)  Now the first document that has
23        been identified as Exhibit 1, could you identify --
```

13

```
1         if you could take that document.  Can you identify
2         that document, please?
3    A.  Yeah, that's a warrant for, at the time, Quanza
4         O'Neill Hawkins and then a Quentin Haskins.
5    Q.  And this document has handwriting under the verses.
6         Is that your handwriting?
7    A.  Yes, it is.
8    Q.  And that's information that was different than the
9         original information submitted on Mr. Hawkins?
10   A.  That's correct.
11   Q.  And was that based on the information that you
12        received from another agency that the individual's
13        real name was Quentin Haskins?
14   A.  That's correct.
```

Page 12

kp112103.txt

15   Q.  On the first third of the page, there is a minimus

16       or commitment area, and it indicates that it's, I

17       guess, a directive to any jailer of Madison County.

18       There is a date of August 28, 2001.  Do you know how

19       that date comes to be placed on the minimus?

20   A.  No.

21   Q.  And was it your decision to decide his bond was

22       $50,000?

23   A.  The warrant magistrate issued that.

14

1   Q.  Okay.  Thank you.  I'm going to ask you to point to

2       Exhibit 2.  I'm first going to ask you do you know an

3       individual by the name of Lieutenant Sherry Jackson?

4   A.  Yes.

5   Q.  And does it indicate she is the custodian of records

6       for the police department of Huntsville?

7   A.  That's correct.

8   Q.  Is she currently in that position?

9   A.  She is not now.

10   Q.  All right.  If you could turn to the second page of

11       the document.  Could you identify this document,

12       please?

13   A.  It's a warrant for a Quentin Haskins.

14   Q.  And did this document -- I'm sorry.  Do you know

15       where this document originated?

16   A.  Yes.  I received this after the other warrant had

kp112103.txt

17    been served.

18  Q.  And you say after your other warrant had been served.

19      What do you mean the other warrant had been served?

20  A.  The sheriff's department, I'd left it with them when

21      I was told that they had the subject in custody.

22  Q.  And was it your understanding that this information

23      came from Cincinnati or Hamilton County?

15

1   A.  The information on this warrant?

2   Q.  That's correct.

3   A.  I'm -- I don't know that, no, sir.

4   Q.  Okay.  In the middle section of the page, there is

5       demographic information or identifying information on

6       the individual.  Could you just -- I know the record

7       speaks for itself, but could you start where it says

8       name, "Quentin Haskins," and proceed to read those,

9       that information there?

10  A.  "Name, Quentin O'Neill Haskins; address, 4233

11      Myrtlewood Drive, Apartment D; city, Huntsville;

12      state, Alabama; alias, Hawkins, Quanza O'Neill."

13  Q.  And down further in that same section there it

14      indicates, it looks like date of birth, race.  Could

15      you identify?

16  A.  "Date of birth, 8/18/1978; race, black; sex, male;

17      hair, black; eyes brown; height 6'2"; weight, 180."

kp112103.txt

18  Q.  Okay.  And is the information that's identified there

19      consistent with what you knew the person Quentin

20      Haskins, known to you as Quentin Haskins, was that

21      true information on him?

22  A.  That's correct.

23  Q.  Do you know if this information or if this particular

                                                            16

1       document was ever sent to Cincinnati or to Hamilton

2       County?

3   A.  I don't know that.

4   Q.  Thank you.  When the warrant was issued, did you have

5       any information on Haskins's whereabouts?

6   A.  I had information he'd gone to Mississippi.  I had

7       information that he had family in Virginia.  Just

8       that kind of hearsay information.

9   Q.  Did have you any information on any surgical

10      procedure that he had undergone after the warrant and

11      before August of 2001?

12  A.  Yes.

13  Q.  What was that information?

14  A.  His girlfriend stated that he had to go to

15      Mississippi for some type of surgery, and they had to

16      cut his lower stomach area.

17  Q.  And from that information, did you also learn that he

18      had some type of identifiable marks from that

19      surgery?

                        Page 15

kp112103.txt

20   A.   He had a scar on his lower stomach area.

21   Q.   Did you receive any information on how large this

22        scar might have been?

23   A.   I don't -- I didn't have that.

17

1    Q.   Did you -- what did you do with this information?

2    A.   That was noted on my information on my case report,

3         my supplements.

4    Q.   Would that have been available to anyone who reviewed

5         the file?

6    A.   Yes.

7    Q.   When did you -- sometime in July or August of 2001,

8         did you receive information that a person known as

9         Quentin Haskins was, in fact, in custody?

10   A.   Yes.

11   Q.   What information did you receive and from whom?

12   A.   I was out of town, and when I returned back in town

13        my supervisor, Sergeant Reynolds, advised me that an

14        arrest had been made.

15   Q.   And did he indicate any details about the arrest or

16        the detention of the individual at the time?

17   A.   That he was arrested in Cincinnati.

18   Q.   Did Sergeant Reynolds give you the names of any of

19        the individuals associated with the arrest or the

20        detention?

kp112103.txt

21  A.  Not that I recall.

22  Q.  Did he advise you of any information that had been

23       communicated with him regarding the individual that

                                                          18

1        was arrested?

2   A.  Say that again.

3   Q.  Did Sergeant Reynolds advise you of any of the

4        information that had been received from Cincinnati

5        regarding the individual that was arrested?

6   A.  No.

7   Q.  Did he advise that he had spoken to anyone in

8        Cincinnati about it?

9   A.  Just that he was at home when he received the

10       information, and that he had contacted someone in

11       that area about the arrest.

12  Q.  Do you recall if he gave you the name of the person

13       that he contacted?

14  A.  I don't recall.  I didn't make notes on that.

15  Q.  Do you know how long after the person was

16       incarcerated that you were advised that the person

17       was, in fact, in custody?

18  A.  That he was here?

19  Q.  No, that he was in Cincinnati in custody?  How long

20       after that happened did you receive information about

21       that?

22  A.  It was, I'm assuming two or three days after he was

                        Page 17

kp112103.txt

23          arrested that I found out about it when I got back in

                                                     19

1           town.

2      Q.   And what did you do once you received that

3           information?

4      A.   It was sometime later that the Madison County

5           Sheriff's Department needed a copy or needed the

6           warrant and needed information from the district

7           attorney's office for the extradition, and I gathered

8           that paperwork up for the Madison County Sheriff's

9           Department.

10     Q.   And when was your next contact regarding this

11          particular case?

12     A.   I checked -- I kept checking to see if Haskins had

13          been extradited back, and on August the 15th, I went

14          to the Madison County Jail to interview Quentin

15          Haskins.

16     Q.   And do you know approximately what time you arrived?

17     A.   It was in the afternoon.

18     Q.   Had you alerted anyone in the district that you were

19          going, or in your police department, that you were

20          going to interview him?

21     A.   I may have mentioned it to Sergeant Reynolds.

22     Q.   What happened when you arrived at the jail?

23     A.   I arrived there, told the jailers that I was there to

                              Page 18

kp112103.txt

20

```
 1        interview Quentin Haskins.  I went to the interview
 2        room and waited for them to bring him to the room.
 3   Q.   And when he arrived in the room what happened?
 4   A.   He stated that he wasn't the subject I was looking
 5        for, that he wasn't Quentin Haskins.  I had a
 6        photograph of the subject I was looking for, Quentin
 7        Haskins.  This subject, it wasn't the same subject
 8        that I had in the photograph.  At that time I
 9        obtained the fingerprint card from the Madison County
10        Sheriff's Department on this subject.  I went to the
11        Huntsville Police Department's ID section where we
12        had a fingerprint card on Quentin Haskins, alias
13        Quanza O'Neill Hawkins.  The tech compared the
14        fingerprint cards and said no, it's not the same
15        subject.
16   Q.   When you initially saw the person who was brought
17        into the room, did you notice any physical
18        similarities between the person that you were looking
19        for and that person?
20   A.   It was black male, the short hair.  The subject that
21        was at the jail was shorter than the information I
22        had on Quentin Haskins.
23   Q.   Do you recall whether his complexion was different
```

kp112103.txt

21

1     than the person you were seeing?

2  A.  All I had was a photograph to go by.

3  Q.  How long did this take from the time that you

4     observed the person who you believed first to be

5     Quentin Haskins and the time that he was ultimately

6     released from the jail?  Approximately how long did

7     that take?

8  A.  It was probably between one and two hours.

9  Q.  What did you do immediately after discovering that

10     this was not the person that you believed he was

11     supposed to be?

12  A.  I called Sergeant Reynolds and advised him, and he

13     called the jail and the judge to make arrangements to

14     have the subject released.

15  Q.  And we've been talking around the person.  Did you

16     later learn the name of the person who you actually

17     met with?

18  A.  It was Quintin Hawkins.

19  Q.  Did you ever sit down and speak with Quintin about

20     the fact that he was there, how he got there or any

21     of that information?

22  A.  Not really.  He said that it wasn't him, and that's

23     basically it.

kp112103.txt

22

1   Q.  About how long would you say your contact with
2       Quintin was?
3   A.  We were down at the south precinct.  I was in and out
4       of where he was at in the, our reception area.
5       Sergeant Reynolds was on the phone.  I was on the
6       phone.  And I was involved in other cases, so it was
7       on and off type contact.
8   Q.  And did you give him your business card before you
9       all separated?
10  A.  I think I did.
11  Q.  To your knowledge, was Huntsville -- strike that.  Do
12      you know how Quintin left Huntsville?
13  A.  I believe Sergeant Reynolds transported him to the
14      airport, and he had a flight out of Huntsville.
15  Q.  And do you know how that flight was arranged?
16  A.  Sergeant Reynolds took care of that.
17  Q.  To your knowledge, was Huntsville ever reimbursed for
18      the cost of sending Mr. Hawkins out of Huntsville?
19  A.  I do not know that.
20  Q.  In your experience as an officer, had you ever
21      experienced an instance where a person who did not
22      match the physical description of a wanted person was
23      extradited to your agency?

kp112103.txt

23

1    A.   I've not been involved with one, and other than that
2         I don't really know.
3    Q.   To your knowledge, was Haskins ever arrested on the
4         murder warrant?
5    A.   Yes, he was.
6    Q.   And how long ago was that?
7    A.   He was arrested in October of 2001.
8    Q.   And did his case ever go to trial?
9    A.   Yes, it did.
10   Q.   When did it go to trial?
11   A.   December of 2002.
12   Q.   What was the outcome of that trial?
13   A.   He was found guilty.
14   Q.   Thank you.  And to your knowledge, is he presently
15        incarcerated?
16   A.   Yes, he is.
17   Q.   Those are the only questions that I have on the facts
18        specifically.  I do have some housekeeping questions.
19        Did you review any documents to prepare for this
20        deposition?
21   A.   I just have my case report and my original murder
22        case.
23   Q.   And did you meet with anyone in the police department

24

kp112103.txt

```
 1        to discuss your testimony for this deposition today?
 2   A.   No.
 3   Q.   Are you familiar with a person by the name of Michael
 4        Harmon?
 5   A.   No.
 6   Q.   Are you familiar with a person by the name of Steve
 7        Lazarus?
 8   A.   No.  I'm sorry, yes.  Yes.  I know who they are, yes.
 9   Q.   To your knowledge, have you ever spoken to either of
10        these individuals by telephone, communicated by
11        e-mail or in person?
12   A.   Yes, yesterday.
13   Q.   And how did you receive notice of this deposition?
14   A.   I walked into the office and one of the secretaries
15        handed it to me.
16   Q.   What day was that?
17   A.   It was Wednesday of this week.
18   Q.   On Tuesday, November the 18th, were you in
19        Huntsville?
20   A.   Had just arrived in Huntsville.
21   Q.   And were you personally served with a subpoena on
22        Tuesday, November the 18th?
23   A.   No, I was not.
```

                                                        25

```
 1   Q.   I'm going to ask you -- it's not going to be marked
```

kp112103.txt

 2        as an exhibit.  I'm going to ask you to take a look

 3        at the subpoena.  It's two pages.

 4  A.  (Witness complies.)  Yes, sir.

 5  Q.  On the second page of that subpoena, it indicates

 6        service.  Do you see proof of service?

 7  A.  Yes, sir.

 8  Q.  It indicates "served on," and your name is written

 9        there?

10  A.  Yes, sir.

11  Q.  Under oath, is your testimony that you were not

12        served with this subpoena particularly, by that

13        particular individual who's named there?

14  A.  That's correct.  I was not at work that day.

15        MR. RUCKER:  Thank you.  At that point, I have

16        no further questions of Investigator Pierce.

17        MR. HARMON:  This is Michael Harmon, counsel

18        for the City of Cincinnati and the Cincinnati police

19        officer defendants.  I have no questions.  Detective

20        Pierce, I want to thank you very much for your time

21        in this matter.

22        MR. LAZARUS:  No questions from Mr. Lazarus

23        either.

26

 1        MR. RUCKER:  Thank you.

 2        MR. PITTS:  No questions.

```
                        kp112103.txt
3            MR. GRIFFIN:  This will end this deposition,

4       12:33 p.m.

5                    FURTHER THE DEPONENT SAITH NOT.

6                       (EXHIBITS ATTACHED AND ENCLOSED.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
```

27

```
1                      C E R T I F I C A T E

2

3       STATE OF ALABAMA
```

kp112103.txt

4

5    MARSHALL COUNTY

6

7         I hereby certify that the above and foregoing

8    deposition was taken down by me in stenotype and the

9    questions and answers thereto were reduced to writing

10   under my supervision, and that the foregoing

11   represents a true and correct transcript of the

12   testimony given by said witness on said occasion.

13        I further certify that I am neither of

14   counsel nor of kin to the parties to the action, nor

15   am I in any way interested in the result of said

16   cause.

17

18

19

20
                          MELANIE REAGAN STRANGE
21                          COURT REPORTER

22

23