rr112103.txt

1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION


QUINTIN HAWKINS,

      Plaintiff,

vs.                                    CASE NO.

THOMAS STANTON, et al.,                C-1-01-783

        Defendants.


DEPOSITION OF:  REX REYNOLDS

      Videographic deposition of REX REYNOLDS,
taken pursuant to Notice, before Melanie Reagan
Strange, Court Reporter and Notary Public, State of
Alabama at Large, in the Ramada Inn, Huntsville
Airport East, 8716 Madison Boulevard, Huntsville,
Alabama, on the 21st day of November, 2003,
commencing at 10:16 a.m. pursuant to the stipulations
set forth herein.


Melanie Reagan Strange, Court Reporter

rr112103.txt

                                                    2

1                    S T I P U L A T I O N S

2            IT IS HEREBY STIPULATED AND AGREED, by and

3    between counsel that the videographic deposition of

4    REX REYNOLDS may be taken on the date and time

5    specified and in the action denominated herein before

6    Melanie Reagan Strange, Court Reporter and Notary

7    Public.

8            IT IS FURTHER STIPULATED AND AGREED that the

9    signature to and reading of the deposition by the

10   witness is waived, the deposition to have the same

11   force and effect as if full compliance had been had

12   with all laws and rules of Court relating to the

13   taking of deposition.

14           IT IS FURTHER STIPULATED AND AGREED that it

15   shall not be necessary for any objections to be made

16   by counsel to any questions, except as to form or

17   leading question, and that counsel for the parties

18   may make objections and assign grounds at the time of

19   trial or at the time said deposition is offered on

20   evidence, or prior thereto.

21           IT IS FURTHER STIPULATED AND AGREED that

22   notice of filing of this deposition by Commissioner

23   is waived.

                                                    3

rr112103.txt

```
 1                    A P P E A R A N C E S

 2

 3        APPEARING ON BEHALF OF THE PLAINTIFF:

 4                Mr. Fanon A. Rucker
                  Attorney at Law
 5                Santen & Hughes
                  312 Walnut Street
 6                Cincinnati, Ohio  45202

 7

 8        APPEARING (via telephone) ON BEHALF OF THE

 9        DEFENDANTS:

10                Mr. Michael J. Harmon
                  Senior Assistant Trial Counsel
11                City of Cincinnati
                  801 Plum Street
12                Room 214
                  Cincinnati, Ohio  45202
13

14                Mr. Stephen Lazarus
                  Attorney at Law
15                Hardin, Lefton, Lazarus & Marks, LLC
                  915 Cincinnati Club Building
16                30 Garfield Place
                  Cincinnati, Ohio  45202
17

18        APPEARING ON BEHALF OF THE CITY OF HUNTSVILLE:

19                Mr. M. Bruce Pitts
                  Assistant City Attorney
20                City of Huntsville
                  P. O. Box 308
21                Huntsville, Alabama  35810

22        ALSO PRESENT:

23                Mr. Don Griffin, Videographer
```

4

```
 1                    I N D E X
```

rr112103.txt

2                    WITNESS:  REX REYNOLDS

3                                              PAGE

4      Examination by Mr. Rucker                 6-54

5      Examination by Mr. Harmon                54-57

6      Examination by Mr. Lazarus               57-58

7      Further Examination by Mr. Rucker        58-60

8

9      Reporter's Certificate of Completion       61

10     ----------------------------------------------------

11                    INDEX OF EXHIBITS

12

13     PLAINTIFF'S EXHIBITS:                  MARKED

14

15     PX-1                                    12

16     PX-2                                    19

17     PX-3                                    19

18     PX-4                                    27

19     PX-5                                    29

20     PX-6                                    31

21     PX-7                                    38

22

23

                                                5

1      11/20/03          PROCEEDINGS          10:16 a.m.

2               MR. GRIFFIN:  On the record, 10:16 a.m.,

rr112103.txt

3    November 21st, the year 2003.  This is the deposition

4    of Mr. Rex Reynolds.  This deposition is taking place

5    at the Ramada Inn Airport, Huntsville, Alabama.  At

6    this time, would the attorneys identify themselves

7    for the record and who they represent starting with

8    the Plaintiff's attorney here in the room.

9         MR. RUCKER:  My name is Fanon Rucker.  I am an

10   attorney with Santen & Hughes.  I represent Quintin

11   D. Hawkins in the case of Quintin D. Hawkins versus

12   Thomas Stanton, et al.

13        MR. GRIFFIN:  Now to the telephone.

14        MR. HARMON:  My name is Michael, middle

15   initial, J. Harmon, H-a-r-m-o-n, Senior Assistant

16   Trial Counsel for the City of Cincinnati representing

17   the Cincinnati police officer defendants.

18        MR. GRIFFIN:  Now for the defendant.

19        MR. LAZARUS:  This is Steve Lazarus, L-a-z, as

20   in zebra, a-r-u-s, also on the phone from Cincinnati

21   as special counsel for the individual officers and in

22   their individual capacities.

23        MR. PITTS:  And I am Bruce Pitts, and I am an

6

1    assistant city attorney with the City of Huntsville,

2    Alabama, and I am here as a representative of

3    Sergeant Rex Reynolds, the witness.

4        MR. GRIFFIN:  Ms. Court Reporter, would you

rr112103.txt

```
 5      swear the witness, please?
 6                         REX REYNOLDS,
 7      being first duly sworn, was examined and testified as
 8      follows:

10      EXAMINATION BY MR. RUCKER:
11   Q. Rex Reynolds, I introduced myself earlier.  My name
12      is Fanon Rucker.  I'm going to be taking your
13      deposition for this case this morning.  Have you ever
14      had your deposition taken before?
15   A. Yes, sir, I have.
16   Q. All right.  Just in general rules, everything that's
17      being said, the court reporter is going to be taking
18      down.  It's a little bit different circumstance here
19      because it's also being videotaped.  But the court
20      reporter cannot take down head nods and head shakes,
21      so I'd ask that any response that you give to any of
22      the questions be made verbally.  The record can't
23      record head nods and head shakes.  If there's any
```

                                                          7

```
 1      time when you need to take a break, please just ask
 2      me.  This is not intended to be a marathon, and I
 3      believe we can get through this relatively quickly.
 4      Do you have any questions of me before we begin?
 5   A. No, sir, I do not.
```

                          Page 6

rr112103.txt

```
 6    Q.   Okay.  For the record once again, could you please
 7         state your name, spell your last name for the record.
 8    A.   I'm Lieutenant Rex Reynolds.  Last name
 9         R-e-y-n-o-l-d-s.  I was a sergeant at the time of the
10         case in question.
11    Q.   And how long have you been with the Huntsville Police
12         Department?
13    A.   I'm in my 24th year.
14    Q.   And what is your assignment currently?
15    A.   I am a shift manager assigned to the south precinct,
16         7900 Bailey Cove Road.
17    Q.   And in July and August of 2001, what were your
18         responsibilities as sergeant for the Huntsville
19         Police Department?
20    A.   I was the supervisor in the major crimes unit, which
21         include the homicide unit.
22    Q.   And so at the time of July or August of 2001,
23         approximately how many open major crimes were under
```

8

```
 1         your supervision?
 2    A.   When you say open major crimes, that constitutes
 3         domestic violence, homicide, child abuse, sexual
 4         offenses.  I couldn't give you an accurate account to
 5         that.  That's an extremely high number.
 6    Q.   At the time, specifically July and August of 2001,
 7         how many other officers were under your supervision
```

Page 7

rr112103.txt

```
 8        as sergeant?
 9    A.  Direct supervision, nine.
10    Q.  All right.  Are you familiar with the NCIC?
11    A.  I am not that familiar with NCIC, no.
12    Q.  Do you know what those initials stand for?
13    A.  National Center for Institute Communication -- I'm
14        not --
15    Q.  Okay.  And do you know, I guess do you know how
16        information is placed in the NCIC?
17    A.  It's done by NCIC operators.
18    Q.  Are you aware of any certification necessary to be
19        able to put in suspect's information into the NCIC,
20        if you know about any of these things?
21    A.  There is a certification necessary, yes, sir.
22    Q.  Are you or were you familiar with the person by the
23        name of Quentin, Q-u-e-n-t-i-n, Haskins?
```

```
                                                          9
 1    A.  I have become familiar with him, yes, sir.
 2    Q.  When did you first become familiar with the name of
 3        an individual, excuse me, with an individual by that
 4        name?
 5    A.  By the name or the individual?
 6    Q.  By that name?
 7    A.  By the name, that name came about as a result of a
 8        homicide that occurred in our jurisdiction on May the
```

rr112103.txt

```
 9        18th of 2001, the victim being a Kurantiya Garner,
10        that occurred at 1302 H Boxwood Drive, and he was the
11        suspect in this homicide.
12   Q.   Who was the investigator for that particular crime?
13   A.   The lead investigator on this homicide was
14        Investigator Kathy Pierce.
15   Q.   Okay.  And was a report generated from that
16        investigation?
17   A.   Yes, there was.
18   Q.   If you know, was Mr. Haskins ever interviewed by
19        Detective Pierce prior to May of 2001 regarding this
20        particular crime?
21   A.   Not that I am aware of.
22   Q.   Do you know if there was a physical description of
23        Mr. Haskins available to the investigators in this
```

                                                            10

```
 1        case prior to a warrant being issued in May of 2001?
 2   A.   There was information.  I can't testify as to the
 3        accuracy of that information, but there was some
 4        information obtained from a previous case that
 5        occurred within our jurisdiction involving Mr.
 6        Haskins to where he provided the police department
 7        false information during the arrest.
 8   Q.   And we'll get into the false information he provided
 9        in that earlier case.  But from that earlier case, do
10        you know if there were photographs of Mr. Haskins
```

rr112103.txt

11        that were taken by the Huntsville Police Department?

12  A.  There was.

13  Q.  And do you know if from that prior investigation

14        there were physical descriptions that were kept

15        regarding Mr. Haskins?

16  A.  There was, and I have in my hand a document from what

17        I retrieved the information from.

18  Q.  We'll get to that in a moment also.  You've indicated

19        that Kathy Pierce was the lead investigator on the

20        case?

21  A.  That is correct.

22  Q.  Who is Kathy Pierce?

23  A.  She's an investigator that worked under my

                                                            11

1        supervision at that time.  She's a homicide

2        investigator.

3  Q.  And did you discuss this matter with her prior to a

4        murder warrant being issued on the case?

5  A.  Sure.  I'm sure there may have been ongoing

6        conversations about the homicide, as we would in any

7        case.

8  Q.  To your knowledge, when the warrant was issued, did

9        you have any information on Quentin Haskins's

10        whereabouts?

11  A.  Not that I'm aware of personally, no.

rr112103.txt

```
12   Q.   Prior to August of 2001, did Huntsville have
13        Haskins's fingerprints on file, to your knowledge?
14   A.   Based on the fact that he was arrested, then we would
15        have had those fingerprints under a different alias
16        name.
17   Q.   Did Huntsville have any information that Haskins had
18        alias names?
19   A.   Yes, we did.
20   Q.   What alias names were you aware of?
21   A.   I have in front of me a BOLO sheet that was generated
22        by Kathy Pierce and maybe myself, I may have assisted
23        in generating this, that involved the initial be on
```

                                                    12

```
 1        the lookout for in reference to the May 17th
 2        shooting, and the alias name was Quanza O'Neal
 3        Hawkins.
 4   Q.   Okay.  Were there any other alias names that
 5        Huntsville had information regarding Mr. Haskins?
 6   A.   It's my understanding, through general conversations,
 7        that there was several different ways that that name
 8        had been changed around.  I can't testify as to what
 9        those are.
10   Q.   Was that information regarding those aliases ever
11        input into any type of computer from Huntsville, if
12        you know?
13   A.   Yes, based on the fact that I have seen NCIC reports
```

rr112103.txt

14        that contain that alias name.

15  Q.  I'm going to show this, I guess, to the camera and

16        then give it to the court reporter for marking as an

17        exhibit.  This will be marked as Plaintiff's Exhibit

18        1 in this deposition.

19            (Whereupon, Plaintiff's Exhibit Number 1

20             was marked for identification.)

21          MR. HARMON:  Could you please describe the

22        exhibit for us?

23          MR. RUCKER:  The exhibit is a document.  The

13

1        top of it states "Notice and Warning, for official

2        criminal justice agency use only."  It's page nine of

3        23 from the city attorney's office, September 19th,

4        2001.  It has been previously entered as an exhibit,

5        I believe in Stanton's deposition.  The bottom corner

6        indicates "This NCIC interstate identification index

7        response is the results of your inquiry on NAM," back

8        slash, "Haskins," comma, Q-u-i-n-t-o-n.  That's a

9        description of the document, and I'll be asking some

10        questions about it.

11  Q.  (BY MR. RUCKER:)  Lieutenant, I'm going to ask you to

12        take a look at the document I've placed in front of

13        you styled as Exhibit 1.

14  A.  Okay, it appears to be an NCIC transaction that

rr112103.txt

15    occurred on May the 21st, 2001.

16  Q.  All right.  And could you describe -- have you seen

17      this document before?

18  A.  I would say that this document resembles some copies

19      that I have seen in looking over this case, yes.

20  Q.  All right.  And the information that's in the bottom

21      corner, does that indicate the FBI number for a

22      Quentin O. Haskins?

23  A.  It does.

14

1   Q.  And though the record speaks for itself, could you

2       read the FBI number that is on that document?

3   A.  The one adjacent to the inquiry named Quentin Haskins

4       is 766087KB5.

5   Q.  All right.  And on the line below the name and FBI

6       number, is there identification for the person's

7       height and weight?

8   A.  Yes, there is.

9   Q.  Could you just read into the record the information

10      from that document?

11  A.  Yes.  "Sex, male; race, black; birth, 8/18 of '78;

12      height, 6'4"; weight, 180 pounds; eyes, brown; hair,

13      black; birthplace, Virginia."

14  Q.  And below that line --

15  A.  It also denotes that there's no photograph.

16  Q.  Okay.  And below that line, there is something that

Page 13

rr112103.txt

17    indicates fingerprint class.  Are you familiar with
18    that terminology?
19  A.  I am not.
20  Q.  And there is also something adjacent to that
21    indicating pattern class.  Are you familiar with that
22    terminology?
23  A.  I am not.

                                              15

1  Q.  Below that it indicates alias names.  Could you just,
2    for the record, read those names that are listed
3    there?
4  A.  Yes.  Alias names listed under Quentin Haskins:
5    O'Neil Haskins, Quentin O'Neil Haskins, Quentin
6    O'Neal Haskins and Quinton O'Neil Haskins; the
7    difference being the spelling of Quentin and O'Neal.
8  Q.  Are any of those items, and normally they speak for
9    themselves, do any of those items there indicate a
10    spelling of --
11  A.  This has been cut off at the bottom.  This is not a
12    complete document.
13  Q.  There is a second page to the exhibit.
14  A.  Okay.  The second page shows 8/23.  This one shows
15    9/23.  I don't know if they go together or not.
16  Q.  If you look at the very bottom, there's an indication
17    of "scars," hyphen, "marks, other alias names."

rr112103.txt

18   A.   Right, uh-huh.

19   Q.   And at the top of the following page it indicates

20        "TAT R arm."

21   A.   Yes, uh-huh.

22   Q.   Would that appear to you to be a contiguous page

23        based on the fact that they're asking about scars and

                                                          16

1         marks?

2    A.   I couldn't say that it goes together because there's

3         nothing that shows that it does.

4    Q.   Would you -- do you know the source of these

5         documents?

6    A.   These documents appear to be NCIC transactions.

7    Q.   Were you aware that they were provided to me by the

8         city attorney's office?

9    A.   I see city attorney office on the top, yes.

10   Q.   And the Page 9 of 23 and then the Page 8 of 23, do

11        you dispute that those appear to have been following

12        each other, at least being sent?

13   A.   I would say they've been sent, yes.

14   Q.   On the alias names, does there appear to be any other

15        alias names that were on the NCIC computer at that

16        time, based on what you have in front of you?

17   A.   I do not see any additional names.

18   Q.   On the following page, on the bottom corner of the

19        page, there is an additional body of information.

                          Page 15

rr112103.txt

```
20      Could you identify just the general nature of that
21      information?
22  A.  Under the wanted person?
23  Q.  That's correct.
```

                                                                17

```
 1  A.  It gives an ORI number, I think, which identifies an
 2      agency name, wanted person being a Quentin Haskins,
 3      male, black, D.O.B -- place of birth Virginia, DOB
 4      being 8/18 of '78, 6'4", 180 pounds.
 5  Q.  Is that information consistent or is it the same
 6      information as appears on the first page of Exhibit
 7      1?
 8  A.  Yes, it appears to be the same.
 9  Q.  And where the FBI number is indicated on that second
10      page, is that also the same FBI number that's
11      indicated on the first page?
12  A.  766087KB5.  It is the same, yes, sir.
13  Q.  Thank you.  You can put that exhibit to the side.  In
14      the early morning hours of July 31st -- and I
15      understand this is over two years ago.
16  A.  Right.
17  Q.  Were you contacted by someone in your office about a
18      call or some kind of communication from LYLE (sic)?
19  A.  I was not.  I was contacted by our records division.
20  Q.  And just for purposes of general information, what is
```

rr112103.txt

21    the records division's purpose or what do they do in

22    the Huntsville Police Department?

23  A.  They have the responsibility of maintaining all

                                                        18

1     records within our department to involve criminal,

2     civil, accidents.  They also serve as an information

3     center, I would think, like NCIC, ROCIC and other

4     outside communique such as that.

5   Q.  And approximately, if you recall, approximately what

6     time was it that you were contacted in those early

7     morning hours?

8   A.  I want to say that it was after midnight.  I was

9     awoken that night by my pager going off, and it was

10    the records division and I returned the call.

11  Q.  All right.  And who specifically from the records

12    division contacted you?

13  A.  I'm pretty sure that it was Esther Funk.

14  Q.  Okay.  And is Esther Funk an operator for the records

15    division of Huntsville?

16  A.  I believe at that time she was a supervisor within

17    the records division, and I know she is now.  I

18    believe that was true then.

19  Q.  What was the nature of the information?

20  A.  Basically that she had information to believe that

21    they had in custody in Cincinnati, Ohio an individual

22    that was wanted for murder within our agency based on

                        Page 17

rr112103.txt

23          a warrant generated by Investigator Kathy Pierce.

                                                      19

1   Q.  And you say that the warrant was generated by Kathy
2       Pierce.  Do you know the date that that warrant was
3       generated?
4   A.  I'll refer here to a copy I have of that warrant, and
5       it was signed on August 14th, 2001.
6   Q.  The warrant was signed on August 14th of 2001?
7   A.  I'm sorry, that was when he was entered in.  I do not
8       have the -- let's see.  Okay.  It was signed on May
9       18th, 2001.
10          MR. RUCKER:  For the record, I am pulling the
11      warrant from the District of Madison County.  It's a
12      two-page document.  The first page that I'm going to
13      be referring to indicates "Affidavit for warrant,
14      form 8."  This will be marked as Plaintiff's Exhibit
15      2.
16      And the warrant itself, where there was an entry on
17      the warrant signed on August 14th, will be marked as
18      Plaintiff's Exhibit 3.
19          (Whereupon, Plaintiff's Exhibit Numbers
20          2 and 3 were marked for identification.)
21  Q.  (BY MR. RUCKER:)  If you would like to briefly take a
22      look at Exhibits 2 and 3.
23  A.  (Witness complies.)
                            Page 18

rr112103.txt

20

1   Q.  For the record, what is Exhibit 2?

2   A.  Exhibit 2 appears to be the underside copy of an

3       original warrant generated by Kathy Pierce and signed

4       by warrant magistrate Ken Taylor.

5   Q.  And is that the warrant that you were describing that

6       was issued for Mr. Haskins?

7   A.  That is true.

8   Q.  Now, the name on the warrant actually is Quanza

9       O' Neill Hawkins.

10  A.  There's actually two names.  It's State of Alabama

11      versus Quentin Haskins, date of birth 8/18 of '78 and

12      then there's an alias of Quanza O'Neill Hawkins with

13      a date of birth of 8/18 of '80.

14  Q.  And do you know who handwrote the information in

15      there?  Looks like there's some handwriting on the

16      name and the alias.

17  A.  I did not see that written in, but it's my

18      understanding, since I supervised Kathy Pierce, I

19      inquired as to why that was written in there, and she

20      advised me she was told to do so by the warrant

21      magistrate once new information was obtained about

22      his identity.

23  Q.  Was that regarding the belief that the person who was

rr112103.txt

21

```
 1        in custody in Cincinnati was operating under the name
 2        of Quentin Hawkins?
 3   A.   I do not think that would be based on that.  I don't
 4        know that when this warrant was signed that they had
 5        information in Cincinnati, but Kathy would have to
 6        testify to that.
 7   Q.   And the physical description of the person on the
 8        warrant, could you read that physical description,
 9        please?
10   A.   Black male, 6'2", 180 pounds, black and brown, 8/18
11        of '80.
12   Q.   And is that information consistent with the
13        information that we referred to in Exhibit 1 that was
14        on the computer?
15   A.   I believe that is consistent, yes.
16   Q.   Okay.  You can place 2 and 3 aside.  All right.
17        Returning to the call from Cincinnati, what did you
18        do when you received information regarding the wanted
19        individual based on the warrant?
20   A.   When I received that call, I, in turn, called a
21        number given to me, I believe by Esther, of
22        513-946-6100.  I called that number and asked to
23        speak to an officer that was involved in the arrest
```

rr112103.txt

22

1      of Quentin Haskins and that officer was not present.

2  Q.  Do you recall that officer's name?

3  A.  I was given the name based on what I had written down

4      on my handwritten notes from my notebook, an Officer

5      Stanon, S-t-a-n-o-n.  I do not know if that spelling

6      is correct.

7  Q.  And when you called back -- how long was it that you

8      called back after you received information regarding

9      the incarcerated individual?

10  A.  As soon as I received the page and spoke with our

11      records division that night is when I called back.

12      Once I spoke briefly with the jailor there, then I

13      asked for contact information on one of the arresting

14      officers so that I could assist in confirming that

15      they did have the individual.  And the number I was

16      given for Officer Stanon was 513-352-3591 with an

17      extension of 470.  I've got the time of 10:50 p.m.

18      written down, and it's the best of my recollection

19      that that hit at a time he was either coming in or

20      going out of probably a roll call area or something

21      to that effect, and I attempted it that night.  Once

22      I hung up, he was not present, and I attempted it

23      again the next day and he, again, was not present.

rr112103.txt

23

 1   Q.   When you called to Cincinnati, did you speak to
 2        anyone about Haskins?
 3   A.   Yes, I spoke to -- each time I called the number, I
 4        couldn't tell you the amount of times.  I wouldn't
 5        say it was over two or three times in a two to three
 6        day period.   The only name that I wrote down in my
 7        notes as speaking to was a Dick Ruzsa, R-u-z-s-a;
 8        there again, I think I based that spelling on the way
 9        I appeared it would be spelled.  And I had a
10        different phone number written down underneath his
11        name of 946-6324.
12   Q.   And I'm still talking about the early morning hours
13        of what would be July 31st, 2001.  Did you have any
14        communication with anyone in Cincinnati regarding
15        their continued incarceration of the person they
16        believed to be Quentin Haskins?
17   A.   I don't know that I did any type of direction about
18        the incarceration, but I spoke to them about one of
19        the physical attributes that I knew of the suspect.
20        Because like I say, I hold in my hand a BOLO sheet
21        from the major crimes unit that I had in my briefcase
22        there in my car there at my residence, and that's the
23        only information that I had to go by.  The only thing

24

rr112103.txt

```
 1        that I did know outside of that, based on a
 2        conversation I had with Kathy Pierce prior to her
 3        leaving town, is that she had at some point during
 4        the investigation received information that the
 5        suspect was in Mississippi.  She was getting
 6        information, I believe, from a relative of Mr.
 7        Haskins, and he, at some point, spent time in the
 8        hospital in Mississippi.  In fact, the initial
 9        information we received had us call that hospital
10        thinking he was still being held there.  And from
11        that call we had learned that that individual had
12        some type of surgery.  I think it dealt with some
13        type of stomach problems, but he had a pretty good
14        wound or scar across his abdomen, and I relayed that
15        to the individual that I spoke to in Cincinnati.
16   Q.   And do you recall that person that you gave that
17        information to in Cincinnati?
18   A.   I do not.  The only name that I noted during my
19        conversations there with those individuals at the
20        jail was a Dick Ruzsa.
21   Q.   When you gave that information to whoever you spoke
22        to, did you give any, did you make any request of
23        them regarding the scar?
```

25

```
 1   A.   I just asked that they might check that, that would
```

rr112103.txt

2      be a way to assist that, and that I would not be able
3      to provide them any additional information until the
4      next day until I could get photographs and send them
5      in.
6   Q. When you requested that they check the scar, was
7      there any response to your request?
8   A. That they would check it.  You've got to realize --
9      and I'm familiar with booking areas, and when I
10     called in it sounded like a very busy place.  The
11     jailer was pretty short in his communications with
12     me, so it was not like it was a long, ongoing
13     conversation, and he just basically said he would
14     check it.  And I called our records division back and
15     told them to attempt to locate a photograph or any
16     way that they could assist Cincinnati in identifying
17     him.  And what they did after that point I don't
18     know.  I just know that when I came in the next
19     morning I received a message -- I  still have the
20     original message -- to call our records division back
21     at 427-7117.
22  Q. Do you recall if there was any discussion about the
23     person having a tattoo?

26

1   A. It would not have come from me that night; however,
2      based on information that our records would have had

Page 24

rr112103.txt

```
 3        there at their exposure was that there was a tattoo
 4        on the right arm that showed specifically "hard knock
 5        life," but I did not have that information on my BOLO
 6        sheet that I had with me.
 7   Q.   Do you know or did you later learn that Esther Funk
 8        had communicated that information to anyone in
 9        Cincinnati on the early morning hours of July 31st?
10   A.   I am not aware of that, no.
11   Q.   Thank you.  Do you recall, was there any discussion
12        regarding photographs of the individual that was
13        incarcerated?
14   A.   Are we referring to that night or the next day at
15        this point?
16   Q.   Either that night or the next morning?
17   A.   The next day I was involved in speaking with our
18        records division in that they had some communique
19        about requesting a photograph.  I received a fax
20        number of 513-946-6149 and requested a photograph.
21        The only photograph that I had at that time was the
22        Huntsville Police Department sheet that comes from
23        our I-LEADS system which contains the alias name of
```

                                                              27

```
 1        Quanza O'Neal Hawkins and a photograph in the upper
 2        left corner, and I faxed that sheet, actually I had
 3        the secretary fax that sheet to Cincinnati.
 4   Q.   And do you recall the number that you sent that to?
```

rr112103.txt

```
 5   A.  The only number I have written down is the
 6       513-946-6149.
 7   Q.  And do you recall who, if anyone, you sent that
 8       attention?  Excuse me.
 9   A.  I do not have that information.  I do not have a copy
10       of that fax sheet.
11   Q.  I don't believe that the hotel has a copy machine.
12       Is that the only copy that you have of the particular
13       photograph that you faxed to Cincinnati?
14   A.  Actually this is a copy, because in my left hand here
15       is the original because it's where it was stapled.
16       This is a copy.
17           MR. RUCKER:  This is a new exhibit that I have
18       in my hand, and it's going to be marked as
19       Plaintiff's Exhibit 4 in this deposition.  I'll
20       provide copies to counsel when I return to
21       Cincinnati.
22           (Whereupon, Plaintiff's Exhibit Number 4
23           was marked for identification.)
```

                                                            28

```
 1   Q.  (BY MR. RUCKER:)  When that document was faxed to
 2       Cincinnati, did you ever get a response regarding the
 3       fact that it was reviewed by someone?
 4   A.  It was my understanding we got communication back,
 5       because I do remember returning to the computer to
```

rr112103.txt

```
 6          obtain a more quality photo, that the photo was not
 7          very clear when it went through the fax.  If you'll
 8          give me just a minute I believe I have a picture of
 9          the other photograph that I retrieved from our
10          I-LEADS system.  And there again, I couldn't tell you
11          exactly what time this was going on, it being such a
12          long time ago, but at some point I called Cincinnati
13          back.  Here is the photograph that I pulled from the
14          system and was going to save, scan that, save that
15          photograph and attempt to e-mail it to Cincinnati.  I
16          called Cincinnati back there to the jail, being this
17          was the only number I had, and requested an e-mail.
18          And whoever I spoke with at that time, I think, was
19          the first to tell me that the individual had, they
20          had already matched the individual with the
21          fingerprints, and it was the suspect that we wanted
22          here in Huntsville.  And so that ended any
23          involvement I had in the identification process, and
```

29

```
 1          they did ask for a contact name as to who would be
 2          sending notification of extradition.  I told them
 3          that would be me; however, it would have to be
 4          authorized by our district attorney, but that I would
 5          make those arrangements.
 6     Q.   You've pulled up a color photograph of a person who
 7          purports to be, would that be Quentin Haskins?
```

Page 27

rr112103.txt

8    A.  That is correct.

9    Q.  All right.  I'm going to show you a black and white

10       photograph and ask you is that the same photograph

11       that's in black and white version?

12   A.  Yes, it is.

13           MR. RUCKER:  Okay.  I'll ask this be marked as

14       Plaintiff's Exhibit 1 (sic.)  For the record, this is

15       the photograph of Quentin O. Haskins, user, colon,

16       KMP, Huntsville Police Department, 05/29/01, 11:24

17       and 44 seconds, previously provided to counsel.

18              (Whereupon, Plaintiff's Exhibit Number 5

19                 was marked for identification.)

20   Q.  (BY MR. RUCKER:)  Now, you've mentioned that there

21       had already been confirmation that the person they

22       had in custody was the person that you all were

23       looking for.  But was there some discussion about

                                                             30

1        fingerprints, either in that early morning hours or

2        later that day?

3    A.  There was a request, but that information would have

4        been dealt through Esther Funk and identification.

5        They were -- obviously, I have copies as you do of a

6        lot of the transactions going on there, but I don't

7        recall that I was specifically involved in any

8        fingerprints.

                         Page 28

rr112103.txt

```
 9   Q.  All right.  After the information that you received

10       from Cincinnati and that you were aware of through

11       Ms. Funk, did you believe that Cincinnati had Quentin

12       Haskins, the person identified in the murder warrant,

13       in custody?

14   A.  I did believe that after they told me that he had

15       been identified by prints, yes.

16   Q.  And what did you do after that?

17   A.  Contacted the district attorney's office.  I believe

18       I spoke with Rob Broussard, one of the assistant

19       district attorneys, and advised him of the details

20       and they had him in custody, that he'd been

21       identified by fingerprints of the individual wanted

22       in our jurisdiction, and that he then communicated

23       with our sheriff's department, because they handle
```

31

```
 1       the extradition process.  And I do not have a copy of

 2       that form, but basically, he sent communique to

 3       Hamilton County for the purpose of extradition.

 4   Q.  And do you know approximately when that communique

 5       would have been sent?

 6   A.  I do not have that information, no.

 7   Q.  And just to regress for one moment, I'm going to show

 8       you what's previously been marked as an exhibit and

 9       will be marked today as Plaintiff's Exhibit 6.

10            MR. RUCKER:  For the record, it is the FBI
```

Page 29

rr112103.txt

```
11        U. S. Department of Justice Clarksburg, to Hamilton
12        County S. O., attention Deputy Lawrence Guthier, the
13        FBI confirmation to counsel.  I'm going to ask it be
14        marked as Plaintiff's 6.
15                (Whereupon, Plaintiff's Exhibit Number 6
16                was marked for identification.)
17   Q.   (BY MR. RUCKER:)  Lieutenant, I'm going to ask you to
18        take a look at that document.  Not necessarily that
19        particular document, but are you familiar with the
20        form of that document?
21   A.   I can identify the document as to what it is.  It's
22        communique from the Department of Justice in
23        reference to Quintin Hawkins.
```

                                                                32

```
1    Q.   And what is that document indicating, from what you
2         observed?
3    A.   Basically in that -- okay, this was sent on August --
4         it appears to be sent on August the 15th, 2001, on a
5         Wednesday at 5:00 p.m. to the Hamilton County records
6         division in reference to Quintin Hawkins.  "The
7         fingerprints you submitted on the above subject are
8         identical with Quintin Dante Hawkins, date of birth,
9         8/18 of '77, FBI number 991 785 CB1."
10   Q.   I'm going to ask you briefly to turn back to Exhibit
11        1 if you still have that in front of you.
```
                             Page 30

rr112103.txt

```
12   A.   (Witness complies.) Okay.
13   Q.   There is an FBI number identified on the bottom
14        corner of Exhibit 1.  Would you once again read that
15        number, please?
16   A.   FBI number beside Quentin Haskins, 766087KB5.
17   Q.   Does that match or is that even similar to the FBI
18        number that's on the FBI confirmation sheet?
19   A.   It does not.
20   Q.   Does the FBI confirmation sheet appear to you to
21        refer in any way to Quentin O. Haskins?
22   A.   It does not.  It refers to Quintin Dante Hawkins.
23   Q.   Thank you.  All right.  What did you do -- you can
```

                                                        33

```
1         lay that to rest.  What did you do after there was
2         communication with the Huntsville DA?  Did you have
3         anymore involvement with actually setting up the
4         transportation of the individual from Cincinnati?
5    A.   I did not; however, you know, as a supervisor, I had
6         questions with the district attorney as to whether
7         our agency would be responsible for his
8         transportation or would they, and I was told that the
9         Madison County Sheriff's Department would arrange
10        that once they had the extradition warrant, I
11        believe, obtained.  I believe they'd need to obtain a
12        governor's warrant.  But between that time I know I
13        received a copy of a waiver of extradition that Mr.
```

rr112103.txt

14         Hawkins had signed.  (Indicating.)

15    Q.   And you're holding up a document that purports to be

16         a waiver of extradition from Hamilton County?

17    A.   That's correct.

18              MR. RUCKER:  That would not be marked as an

19         exhibit in this case.  It's previously been marked as

20         an exhibit in prior depositions, and will likely be

21         introduced at trial.

22    Q.   (BY MR. RUCKER:)  Is there an indication on the

23         document that Mr. Hawkins was represented by an

                                                              34

1          attorney in that document?

2     A.   There is a witness name, and I cannot -- it's not

3          legible.  Just says "I have full knowledge of the

4          fact that I have a legal right to an extradition

5          hearing and voluntarily waive this right.  There have

6          been no promises, threats or incidents made to me in

7          order to secure my signature to this document."  I do

8          not see anything concerning legal counsel.

9     Q.   Thank you.  When did you next receive information

10         about the person coming from Cincinnati?

11    A.   I received information, I believe, from the Madison

12         County Sheriff's Department that that individual had

13         arrived in their jail.  They actually notified the

14         south precinct.  They notified me.  I stepped back to

                             Page 32

rr112103.txt

15      Kathy Pierce's office and/or may have contacted her

16      in the field.  I don't recall which, but told her

17      that he was there and that I requested she go there

18      and interview the suspect.

19   Q.  And did you receive subsequent communications from

20      Ms. Pierce?

21   A.  I did.  She contacted me back by cell phone telling

22      me that she did not believe that the individual she

23      just spoke with was, in fact, the individual wanted

35

1       for murder in our jurisdiction.

2    Q.  Did she explain to you why she believed that was the

3       case?

4    A.  Initially she said that the description did not fit.

5       She felt like it was somewhat similar facial, but

6       what she had written down did not fit.  I told her

7       that I needed more confirmation than that, and she

8       said, "I'm in route to get it.  I've had the county

9       take his fingerprints.  I've got a fingerprint card."

10      And she was going to have it matched.  I advised her

11      to call me back.  She did so some matter of time, one

12      hour, if it was even that long, and she told me that

13      our fingerprint technician had advised that the

14      fingerprints that we had on file for the individual

15      wanted in this murder did not match the individual

16      that was brought here from Cincinnati.

Page 33

rr112103.txt

17    Q.    What did you do next?

18    A.    At that time I contacted the sheriff's department,

19          the jail direct, told them the situation that I had.

20          Told them -- I requested that he be moved to a

21          solitary unit, to go ahead and let him get dressed,

22          and that I would be finding out the process as to

23          what I needed to do to correct what had occurred

                                                              36

1           there.  But I knew I needed to initially get him out

2           of the jail, so I tried to contact the sheriff direct

3           because I was told that that was the most direct way

4           to have him removed from the facility, and the

5           sheriff was out of pocket.  I contacted a judge

6           direct, Susan Moquin, and asked if she could

7           assistant in having this individual released from

8           jail.  She said she would hear the information.  Then

9           contacted Randy Diehl with the district attorney's

10          office, and he coordinated with Susan Moquin's office

11          as to the proper paperwork needed to have him

12          released from the jail.  He was, within a few hours,

13          taken out of that jail, if that long, and I

14          instructed Kathy Pierce to bring him to our office

15          there at 7900 Bailey Cove Road.

16    Q.    Now, you indicated that he was asked to be removed to

17          solitary.  Was he in general population prior to that

                          Page 34

rr112103.txt

18      time?

19  A.  I wouldn't know.  I'm not familiar -- I know there

20      are a lot of areas of general population, and I had

21      concerns if he was in that, and I had him sent to

22      solitary.  He may have already been there.  I don't

23      know that.

37

1   Q.  Had you received information regarding the victim's

2       family in the original murder and them being in the

3       lockup also?

4   A.  I don't think I'm aware of that, no.

5   Q.  Were you aware that there were individuals who

6       believed that the person who was in lockup was, in

7       fact, Quentin O'Neal Haskins?

8   A.  I'm not aware of what anybody would know.  I don't

9       know how knowledgeable it was that that's who the

10      individual was or that we was even bringing him back.

11  Q.  When he was instructed to be brought to you, did you

12      actually sit down and speak to him?

13  A.  I did.  And the reason I was somewhat involved, by

14      that time -- we stayed late that day trying to make

15      this thing happen as far as getting him out of jail.

16      And for lack of a better reason, I believe Kathy had

17      a tennis match that afternoon and she asked if she

18      could, you know, could I handle it for her and I did.

19  Q.  Where physically did you sit down and talk to this

rr112103.txt

20       individual?
21   A.  I believe he sat in the front office there on Bailey
22       Cove Road, because I know that he asked to utilize
23       the phone and I allowed him to do so, and then I

                                                        38

1        asked him basically what he wanted to do, you know,
2        what did he need to do, where did he need to go.  And
3        he communicated that he wanted to go back to
4        Cincinnati.  From that, I contacted Major Dennis
5        Wooten, because it was obviously going to involve an
6        expenditure, and told him what had occurred and felt
7        like it was best that we get him back to Cincinnati.
8        So I contacted Delta Airlines and ultimately had him
9        set on a 8:25 flight back to Cincinnati, and I
10       personally took him out there.
11   Q.  I'm going to show you what's going to be marked as
12       Plaintiff's Exhibit 7.
13               (Whereupon, Plaintiff's Exhibit Number 7
14               was marked for identification.)
15   Q.  (BY MR. RUCKER:)  Could you identify just the form of
16       that document, disregarding the little scribbly in
17       the upper right-hand?
18   A.  It appears -- it just says "Delta flight 931," which
19       is consistent with a note written down in my
20       notebook, an 8:25 flight.

rr112103.txt

21    Q.  Is that your handwriting?

22    A.  It is not.

23    Q.  Is this, to your knowledge, the information regarding

                                                            39

1         the flight that mister -- well, did you later find

2         out who the person was who you had been speaking

3         with?

4                   MR. HARMON:  Objection.

5                   MR. RUCKER:  I'm sorry?

6                   MR. HARMON:  Note an objection.  Speaking

7         about what, speaking with.

8                   MR. RUCKER:  First of all, the court reporter

9         asked for you to identify yourself during the

10        objection.

11                  MR. HARMON:  Okay.  Pardon me, Ms. Reporter.

12        This is Michael Harmon, attorney for the City of

13        Cincinnati and the defendant officers.

14                  THE WITNESS:  Okay.  I do go ahead and answer

15        with an objection, correct?

16                  MR. PITTS:  Yes, you can answer.

17                  THE WITNESS:  I'm going to refer to a copy of

18        a document that I have.  I had spoken with Delta

19        Airlines.  Our concern was the individual that I was

20        speaking with had no identification, and we were not

21        sure how we were going to be able to let him fly.  I

22        spoke with a Delta supervisor.  They advised that

rr112103.txt

23          they needed something on departmental letterhead from

                                                              40

1           me identifying the subject as to how we know him,
2           basically.  This was on August the 15th, 2001.  I
3           made the memo to Delta Airlines representative per
4           the previous conversation.  "I am verifying that the
5           individual traveling under confirmation BXVKNV is
6           known to me as Quintin Dante Hawkins, a black male,
7           8/18 of 1977.  Subject has no identification due to
8           previous transportation to Huntsville, Alabama.
9           Directed by the Madison County Sheriff's Department
10          and authorized by the Madison County District
11          Attorney's Office.  Transportation was based on
12          information received from the Hamilton County Jail."
13    Q.    And how did you spell Quintin's name in that
14          communication?
15    A.    Q-u-i-n-t-i-n.
16    Q.    Before you took Quintin to the airport, did you show
17          him any documents or speak to him about what had
18          occurred a couple weeks prior with regard to Hamilton
19          County?
20    A.    I think we talked in general terms as to how it came
21          about.  He was inquisitive as to how this all came
22          about, and I even had a couple of questions for him
23          in that, I guess my most potent question was that,

                          Page 38

rr112103.txt

41

```
 1        you know, if you knew you were not involved in this
 2        homicide and you knew that you were not the
 3        individual in this warrant, why did you waive
 4        extradition to come to Alabama, and he stated that
 5        his attorney told him to.
 6    Q.  He said his attorney told him to?
 7    A.  That is correct.
 8    Q.  He didn't happen to give that attorney's name, did
 9        he?
10    A.  Did not.  I understood that he said it was a friend
11        of the family.
12    Q.  Did you show him any of the documents that had been
13        sent to Cincinnati?
14    A.  I would say I probably did not because I probably
15        didn't have access to it.  All of that was in the
16        original file.  Kathy was back in town at that point,
17        and I would not have, I would not have had that
18        information.
19    Q.  Do you know if Kathy showed him anything?
20    A.  I couldn't testify to that.
21    Q.  Did you tell him that you had had communication with
22        Cincinnati on the early morning hours of July 31st
23        and subsequent to that?
```

rr112103.txt

42

```
 1   A.   I told him that we had talked to Cincinnati on
 2        several occasions.
 3   Q.   And did you advise him that you had spoken to them by
 4        phone?
 5   A.   That would be reasonable.  I can't recall my exact
 6        conversation, but yeah, that would be reasonable.
 7   Q.   And when I asked spoken by phone, is that phone as
 8        opposed to or in addition to by computer?
 9   A.   Yeah, I would say both, I mean, if you're asking me
10        did we do that, then the answer would be yes by both
11        phone and computer, but not computer as in personal,
12        as in a single unit, but as in the NCIC.
13   Q.   And to your knowledge, Quintin got on the plane and
14        got back to Cincinnati?
15   A.   Yes, he did.  In fact, I believe I stayed there until
16        we went through the security checkpoint.
17   Q.   How much was the plane ticket?
18   A.   A lot, I know.  The City of Huntsville paid for that.
19        I do not have that document, but I want to say it was
20        well over 700-and-something dollars.
21   Q.   Was that a first-class plane ticket?
22   A.   Should not have been.
23   Q.   Okay.  But it was over $700?
```

rr112103.txt

43

1    A.   I would say it was about $700, yes.

2    Q.   Do you know if you all have any receipts for that

3         charge or anything showing that charge in your

4         records?

5    A.   We do have receipts reflecting that, obviously,

6         because I had to forward them to Susan Crowson, our

7         accountant, but I do not have a copy of that with me,

8         no.

9              MR. RUCKER:  I hope that we'll be in

10        communication after this deposition.  I'll ask that

11        if you have that, I can make a copy of it and fax it

12        or send it to me if that would be possible.

13             MR. PITTS:  We can provide that, no problem.

14             MR. RUCKER:  Thank you.

15   Q.   (BY MR. RUCKER:)  What did you do when you returned

16        to the station from dropping Quintin at the airport?

17   A.   I don't think I did return to the station.  I think I

18        went home at that point.  It was well, several hours

19        after the end of my shift.

20   Q.   Did you speak with anyone at the police station

21        within 24 hours after you took Quintin to the

22        airport, about the incident?

23   A.   You know, I want to say I had some communication with

rr112103.txt

44

```
 1        someone at some point after that, but I don't, I
 2        couldn't tell you who or what the basis was.  So
 3        many, so many phone calls and so many electronic
 4        transactions there, I couldn't recall.
 5    Q.  Were any documents, do you know, generated from this
 6        particular incident within the Huntsville Police
 7        Department?
 8    A.  Any documents?
 9    Q.  Memos, notes?
10    A.  The only additional one that I was aware of was a
11        supplement report that I received a copy of that
12        Esther Funk had entered into the computer system.
13    Q.  All right.  Did you draft any memos or notes to
14        submit to anyone within the police department
15        regarding this incident?
16    A.  A memo, I would not say so, no.  I know that I had an
17        occasion to sit down and brief my major, particularly
18        after he had that $700 bill on that ticket.  The
19        following day I was called up there, and I briefed
20        him on what occurred.
21    Q.  Was there also an expense for the transportation
22        service?
23    A.  If there was that would be, that would be to the
```

45

rr112103.txt

```
 1        Madison County Sheriff's Department.  That's a
 2        budgeted item through their system.
 3   Q.   Thank you.  Did you contact anyone in Cincinnati
 4        after Quintin was placed on the plane?
 5   A.   That night, no, I did not.
 6   Q.   At any time subsequent to that, within the week after
 7        that?
 8   A.   There again, I do believe I spoke with somebody,
 9        because after the conversation with my major we were
10        somewhat requesting Cincinnati to pay the bill for
11        having him sent back.  And I know that was -- but who
12        I had a conversation with, I couldn't advise.
13   Q.   I'm going to show you a document that's previously
14        been marked as an exhibit but will not be entered as
15        an exhibit here.  It's a handwritten letter beginning
16        "Dave," and it ends with "Dick."  And it has at the
17        bottom, "Sergeant Rex Reynolds, Homicide."  I'm just
18        going to ask you to take a look at this document,
19        read through that, and ask if that refreshes your
20        recollection as to who you talked to and what you
21        talked to them about?
22            MR. HARMON:  Objection.  For the record, this
23        is Michael Harmon for the City of Cincinnati and the
```

46

```
 1        police officers from Cincinnati.  Go ahead.
```

rr112103.txt

```
 2          THE WITNESS:  Okay.  Now this is obviously not
 3      my handwriting.  Are you suggesting it is?
 4   Q. (BY MR. RUCKER:)  No, I'm just asking you to take a
 5      look at that document, if that helps you refresh
 6      your recollection as to who you talked to and what
 7      you talked about?
 8   A. "Dave, Sergeant Rex Reynolds from Huntsville, Alabama
 9      P. D. called me about this inmate.  He stated that he
10      is not the guy" --
11   Q. Well, you don't have to read the document.  It's been
12      previously admitted as a deposition, as an  exhibit.
13   A. That's okay.  I want to read it.
14   Q. Okay.
15   A. "The Sergeant says that the tattoos don't match.  I
16      faxed Alabama the copy of the NCIC hit that they
17      entered, along with a copy of the letter from the
18      FBI.  The FBI numbers match.  Sergeant Reynolds
19      thought that we were the department that erred.  I
20      pointed out to him that the guy that we had in
21      custody and the guy who they entered in NCIC had the
22      same fingerprints.  We will most likely hear more
23      about this guy.  If he sues, I believe he has a
```

47

```
 1      winner."  And then it's got, "Sergeant Rex Reynolds,"
 2      and it's got my phone number and it's signed by,
```

Page 44

rr112103.txt

```
 3        looks like Dick.
 4   Q.   Does that help to refresh your recollection as to the
 5        conversation that you may have had with someone in
 6        Cincinnati after Quintin was taken to the airport and
 7        placed on an airplane?
 8   A.   Not really, no.  I had several conversations there,
 9        but I don't know that I was ever in a conversation
10        about the tattoos.  He -- I'm not sure who Dave is,
11        but -- or excuse me, who Dick is, unless that's Dick
12        Ruzsa.  I would have only talked to him right there
13        either that night or the next day, and I wouldn't
14        have had any information about the tattoos.  But now,
15        he may have spoken to our records division, and then
16        also based on what I had said, but I don't -- I don't
17        know, I mean.
18   Q.   Did you speak to Dick Ruzsa or Richard Ruzsa at any
19        time after Quintin was on a flight about the plane
20        ticket?
21   A.   I called someone afterwards, yes.  Who it was, I
22        couldn't advise.  Now I would imagine that seeings
23        how this is the only phone number I had, I would have
```

                                                          48

```
 1        called that number back.  That is correct.
 2   Q.   What was the nature of that conversation, if you
 3        recall?
 4   A.   You know, basically inquiring into how this could
```
                        Page 45

rr112103.txt

```
 5        have occurred.
 6   Q.   Did the person that you spoke to offer to pay any
 7        money on the cost incurred by Huntsville?
 8   A.   Did not.
 9   Q.   To your knowledge, has Huntsville ever been
10        reimbursed for the plane ticket that was given to Mr.
11        Hawkins to return to Cincinnati?
12   A.   To my knowledge, no.
13   Q.   And if you can answer this question:  Who do you
14        believe owes Huntsville the money for the cost it
15        incurred in this matter?
16             MR. HARMON:  Objection, but you may answer.
17        This is Mike Harmon again for the City of Cincinnati.
18             THE WITNESS:  Based on what I can tell you
19        what my boss felt like, that it should come from
20        Cincinnati.  Now, I will say this, that during this
21        process I was never aware that there was a difference
22        between the Cincinnati Police Department and the
23        facility.  And you know, I've now found out that
```

                                                              49

```
 1        Hamilton County operates a facility, and Cincinnati
 2        P. D. brings the people into that facility.  So a lot
 3        of times I may be referring to "they" or "them" and
 4        may not be specific as to who I'm talking about.
 5   Q.   (BY MR. RUCKER:)  Did you subsequently learn or was
```

rr112103.txt

```
 6         it subsequently brought to your attention that the
 7         Cincinnati police and perhaps Hamilton County were
 8         working together in some way regarding the arrest and
 9         incarceration of Mr. Hawkins?
10             MR. HARMON:  Objection.  Mike Harmon from the
11         City of Cincinnati again.  Go ahead.
12             THE WITNESS:  I am not aware of that.
13  Q.  (BY MR. RUCKER:)  Prior to August of 2001, had you
14         ever communicated with any police agency who
15         indicated they had a wanted felon that you all were
16         looking for?
17             MR. PITTS:  Do you need him to rephrase that?
18             THE WITNESS:  Yeah, I'm not -- are you talking
19         about this case or any case?
20  Q.  (BY MR. RUCKER:)  Any case?
21  A.  Say that question again.
22  Q.  Well, prior to this incident with Mr. Hawkins, had
23         you ever communicated with any police agency similar
```

                                                              50

```
 1         to what happened in the early morning hours of July
 2         30th, who indicated that they had a wanted felon that
 3         Huntsville was looking for?
 4  A.  I'm sure I have, yes, in 24 years of law enforcement.
 5  Q.  In your experience as an officer, had you ever
 6         experienced an incident where a prisoner who did not
 7         match the physical description of the wanted person
```

                          Page 47

rr112103.txt

```
 8       was extradited to your agency?
 9            MR. HARMON:  Objection.  Mike Harmon, City of
10       Cincinnati.  You may answer.
11            THE WITNESS:  I'm not aware of that occurring.
12   Q.  (BY MR. RUCKER:)  Was Haskins ever arrested for the
13       murder warrant; do you know?
14   A.  He was.
15   Q.  Do you know how long after or prior to this incident
16       he was arrested?
17   A.  I do not have that information.
18   Q.  All right.  The next several questions I have are
19       more housekeeping matters, something I have to take
20       care of when I get back to Cincinnati.  Did you
21       receive any document -- excuse me.  Did you review
22       any documents to prepare for this deposition?
23   A.  I reviewed my own documents, that is correct.
```

                                                         51

```
 1   Q.  And that's, for the record, the file that you have in
 2       front of you that you've referred to different times
 3       during this deposition?
 4   A.  That is correct, most of which are copies that are
 5       after the case, and some of which are original notes
 6       from my notebook that I had in the original file.
 7   Q.  Thank you.  Did you meet with anyone within the
 8       Huntsville Police Department to discuss your
```

**Page 48**

rr112103.txt

9          testimony today?

10   A.   I don't think we actually discussed my testimony.  We

11         discussed the case in general.  That was done

12         yesterday in Mr. Pitt's office.

13   Q.   Thank you.  Are you familiar with a person by the

14         name, prior to this deposition, by the name of

15         Michael Harmon?

16   A.   Yes, I am.

17   Q.   And were you familiar with the person, before the

18         deposition today, with a person by the name of Steve

19         Lazarus?

20   A.   Yes, I am.

21   Q.   And have you ever spoken with either of those

22         individuals by phone, e-mail or in person prior to

23         the deposition today?

52

1    A.   I had received several calls, several meaning less

2          than probably three, from, I believe, both

3          individuals to my message center there at my office.

4          I work third shift, so it's hard to communicate with

5          me.  Requested that they'd like to speak to me.  I

6          know that on at least two occasions I called Mr.

7          Lazarus back and gave him the information to Mr.

8          Pitts that he would need to go through his office,

9          and I think I did the same for Mr. Harmon.

10   Q.   Did you ever personally speak with either of these

rr112103.txt

11      individuals about the facts of the case regarding

12      Quintin Hawkins?

13  A.  Yes.  We discussed, in generally, yesterday by

14      speakerphone in Mr. Pitt's office.

15  Q.  Was it during your conversation with -- strike that.

16      How did you receive notice of this deposition?

17  A.  First I heard of it, Mr. Pitts contacted me by cell

18      phone in Baltimore, Maryland.

19  Q.  And is it true that you were, in fact, in Baltimore,

20      Maryland on Tuesday morning?

21  A.  I was in Baltimore.  I flew out there on Saturday

22      morning, and I did not return until Wednesday

23      afternoon.

53

1   Q.  Were you scheduled to return on Wednesday?

2   A.  I was scheduled to return on Wednesday.

3   Q.  I'm going to show you a document.  It's not going to

4       be marked as an exhibit because it's not pertinent to

5       the case, but for my own purposes I'm just going to

6       ask you to take a look at that document, both the

7       first and second pages.  For the record, this is a

8       copy of the subpoena that was allegedly served on

9       Lieutenant Reynolds.

10  A.  I have never seen this document.

11  Q.  And on the second page where it indicates personally

Page 50

rr112103.txt

12          served and who it was served on, is that your name

13          written there?  (Indicating.)

14     A.   Yes, it is.

15     Q.   And once again, it's your testimony that you were not

16          personally served a subpoena in this case?

17     A.   It says personal here, manner of service, but no.  I

18          still have not seen a copy of this subpoena simply

19          because I have not been back to my office.  If it

20          exists, then it is there.

21     Q.   And in fact, as we've discussed and just hammering

22          the point, you were, in fact, out of town on November

23          18th when it indicates that that subpoena was

54

1           personally served on you; is that correct?

2      A.   I was out of town.  I was in Baltimore.  That's

3           correct.

4                MR. RUCKER:  Thank you.  I don't have any

5           further questions.  I don't have any further

6           questions, Mike and Steve.

7                MR. HARMON:  Can we -- I request that the

8           exhibits that you've shown him, if those can be faxed

9           up to us, then we have an opportunity to ask him some

10          questions.

11               MR. RUCKER:  That's assuming that there's a

12          fax machine available here.  I'm not aware of whether

13          there is or is not.  I can find out.

rr112103.txt

14          MR. HARMON:  Okay.  That would be great.  If
15     we could go off the record here maybe and see if we
16     can get that accomplished and then maybe follow up
17     with some questions.
18          MR. GRIFFIN:  Off the record, 11:20 a.m.
19          (Whereupon, a brief recess was taken.)
20          MR. GRIFFIN:  Back on the record, 11:40.
21
22     EXAMINATION BY MR. HARMON:
23  Q.  Thank you.  This is Michael Harmon, attorney for the

55

1      City of Cincinnati and the Cincinnati police officer
2      defendants.  Officer Reynolds, it is correct, isn't
3      it, that at mid afternoon yesterday, the 20th of
4      November, that I did talk to you on the phone; is
5      that correct?
6   A.  Yes, sir, that is correct.
7   Q.  And we just talked about -- I asked you what you knew
8      about the case?
9   A.  Yes, sir.
10  Q.  Now, in this deposition, you have referred to the
11     fact that the night that you got the call from your
12     records people about the apprehension in Cincinnati
13     of the suspect, that you had in your car what's
14     called a BOLO sheet on this case?

Page 52

rr112103.txt

```
15   A.   That is correct.
16   Q.   Could you please tell for the record what is meant by
17        BOLO sheet?
18   A.   It's just basically for our interdepartmental
19        purposes.  It just says "Major Crimes Unit, BOLO,"
20        which means be on the lookout for.  And this is a
21        document that me and Kathy generated and was handed
22        out at all roll calls in all three precincts within
23        our department.
```

56

```
 1   Q.   Okay.  Thank you.  Now, calling your attention to the
 2        Exhibit Number 6 of your deposition, could you take a
 3        look at that.  That's the exhibit that has the
 4        communication from the FBI in Clarksburg on July
 5        31st, 2001.
 6   A.   Yes, sir, it is.
 7   Q.   Down at the bottom part of that exhibit where you see
 8        the name, Hawkins, Quintin Dante, D. O. B. 8/18/77?
 9   A.   Correct.
10   Q.   Do you see the FBI number?
11   A.   Yes, sir.
12   Q.   Do you see the words -- right next to the FBI number
13        are the stars, and then it says "wanted, check NCIC."
14   A.   Yes, sir.
15   Q.   How do you interpret the significance of the word
16        "wanted" on that document at that point?
```
                        Page 53

rr112103.txt

```
17           MR. RUCKER:  Objection.  Go ahead and answer
18      if you can.
19           THE WITNESS:  Wanted in criminal terminology
20      means that they are, a department wants them, either
21      for an inquiry or an actual warrant.
22  Q.  (BY MR. HARMON:)  Okay.  Thank you.  Now lastly,
23      you've indicated that you talked to some people on
```

                                                        57

```
 1      the phone in Cincinnati about this matter, but on
 2      July 31st and afterwards the only person that you
 3      think you know by name that you talked to was this
 4      Dick Ruzsa; is that correct?
 5  A.  That is the only name that I documented in my
 6      original notes, that is correct.
 7  Q.  And you were never able to reach contact with
 8      officer, Cincinnati Officer Stanton; is that correct?
 9  A.  To my knowledge I never spoke with that officer, no.
10  Q.  Did you ever speak to Cincinnati Officer Michael
11      Macchenheimer if you know?
12  A.  I have never heard that name before, so the answer
13      would be no.
14  Q.  Did you ever speak to a Cincinnati Officer Rodney
15      Pompey at all?
16  A.  No, not that I'm aware of.
17           MR. HARMON:  Thank you.  I have no further
```

                          Page 54

```
                         rr112103.txt
18      questions.  Mr. Lazarus may have a question or two.

19

20      EXAMINATION BY MR. LAZARUS:

21   Q. Yes, Lieutenant Reynolds, this is Steve Lazarus.

22   A. Yes.

23   Q. I wanted to just clear up one thing.  During your
```

                                                        58

```
 1      testimony, you've referred to Cincinnati and the

 2      issues of whether Cincinnati had Quintin Hawkins or

 3      that you talked to Cincinnati.  Could you explain

 4      what you meant by the term Cincinnati?

 5   A. I would assume -- well, I would not even say assume.

 6      When referring to Cincinnati meaning a geographical

 7      area in that that's where I was calling.  Now, I did

 8      believe that the fact that I was aware that the

 9      communiques were coming from Cincinnati, that I was

10      speaking with Cincinnati P. D.; however, early on

11      when relating back to some of the documents that I

12      received, I then understood that I was speaking with

13      Hamilton County's Detention Facility.

14           MR. LAZARUS:  All right.  I think that's all I

15      have.  Thank you very much for clearing that up.

16

17      FURTHER EXAMINATION BY MR. RUCKER:

18   Q. I have a couple of follow-up questions to those.  Who

19      did you believe arrested Mr. Hawkins?
                         Page 55
```

rr112103.txt

```
20   A.   It was -- I was told -- it was my understanding that
21        Cincinnati P. D. had arrested.
22   Q.   And is that specifically where you got the name
23        Thomas Stanton or Stanton, S-t-a-n-t-o-n?
```

59

```
 1   A.   No, actually I was given that name from an individual
 2        that answered the phone at the 513-946-6100 number.
 3   Q.   And was it your understanding that Stanton was the
 4        contact in Cincinnati on this particular matter?
 5   A.   I was told --
 6             MR. HANSON:  Objection to the term Cincinnati
 7        being used.
 8             MR. RUCKER:  I didn't say Cincinnati.
 9             MR. HARMON:  Maybe if you can repeat it.  I
10        thought I heard was it your understanding that that
11        was the contact in Cincinnati.
12             MR. RUCKER:  No, I said, was it your
13        understanding that Stanton was the contact on this
14        matter.  I never did say in Cincinnati on this
15        matter; that Stanton was the contact on this matter.
16             MR. HARMON:  Objection.
17             THE WITNESS:  It was -- I was told
18        specifically that I would need to speak with Officer
19        Stanon (sic,) as he was the arresting officer, and at
20        that time, I was given the phone number of
```

```
                          rr112103.txt
21        513-352-3591, extension 470, and because that would
22        be an area he would be at at 10:50 p.m. at night.
23                 MR. RUCKER:  Thank you.  No further questions.
```

                                                      60

```
 1                 MR. HARMON:  I have no further questions.
 2        Thank you very much, Detective, Lieutenant.
 3                 MR. RUCKER:  Steve, do you have anything else?
 4                 MR. LAZARUS:  Nothing further.
 5                 MR. GRIFFIN:  This is the end of this
 6        deposition, 11:46 a.m.
 7                    FURTHER THE DEPONENT SAITH NOT.
 8                 (EXHIBITS ATTACHED AND ENCLOSED.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

rr112103.txt

23

61

1                    C E R T I F I C A T E

2

3        STATE OF ALABAMA

4

5        MADISON COUNTY

6

7               I hereby certify that the above and foregoing

8        deposition was taken down by me in stenotype and the

9        questions and answers thereto were reduced to writing

10       under my supervision, and that the foregoing

11       represents a true and correct transcript of the

12       testimony given by said witness on said occasion.

13              I further certify that I am neither of

14       counsel nor of kin to the parties to the action, nor

15       am I in any way interested in the result of said

16       cause.

17

18

19                              _____

20                              MELANIE REAGAN STRANGE

21                              COURT REPORTER

22

23

rr112103.txt